## GOLF COURSE MANAGEMENT AGREEMENT

THIS GOLF COURSE MANAGEMENT AGREEMENT is made and entered into as of the 31st day of August_____, __2000__, by and between SPORTS SHINKO (MILILANI) CO., LTD., a Hawaii corporation ("Owner"), and RESORT MANAGEMENT SERVICES (HAWAII), INC., a Hawaii corporation ("Operator").

### RECITALS

This Agreement is made and entered into with the understanding by the parties of the following facts:

    A.    Owner owns the Property and Golf Course (hereinafter defined).

    B.    Owner desires to retain, and Operator is prepared to provide to Owner, Operator's assistance and services, as Owner's agent, in managing, operating and promoting the Golf Course for the account of Owner upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

DEFINITIONS

    1.1    Definitions. The following words and phrases as used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning and intent:

    (a)    Accounting Period. Accounting Period shall mean either of the following at the election of Operator, provided such election shall be consistently applied:

    (1)    a full calendar month (or partial calendar month if at the beginning or end of the term hereof); or

    (2)    each of the three (3) successive periods within a fiscal quarter, consisting of four (4) weeks, four (4) weeks and five (5) weeks, respectively.

EXHIBIT _3_



EXHIBIT
5
S. Kinoshita
4-19-05

(b)    Adjusted Gross Operating Profit.  Adjusted Gross Operating Profit shall have the meaning set forth in Section 7.1(b).

(c)    Affiliate.  An Affiliate of any person or entity shall mean any other person or entity which directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with, such person or entity.

(d)    Annual Projection.  Annual Projection shall have the meaning set forth in Section 5.1.

(e)    Annual Statement.  Annual Statement shall have the meaning set forth in Section 5.4.

(f)    Base Management Fee.  Base Management Fee shall have the meaning set forth in Section 7.2.

(g)    Capital Budget.  Capital Budget shall have the meaning set forth in Section 5.1.

(h)    CPI Adjuster.  CPI Adjuster shall mean the percentage by which the CPI, at the time of application of the CPI Adjuster, exceeds the CPI in effect as of the end of the last full calendar month preceding the date of this Agreement.  "CPI" shall mean the Consumer Price Index, United States City Average, All Urban Consumers, All Items, published from time to time by the United States Bureau of Labor Statistics.  If the CPI is discontinued, a comparable index published by any governmental agency or recognized authority shall be used in place thereof, subject to the reasonable approval of Owner and Operator.

(i)    Commencement Date.  Commencement Date shall mean September 1, 2000

(j)    First Class Standards.  First Class Standards shall mean the standards pursuant to which golf courses comparable to the Golf Course, offering the level and type of service available at the Golf Course and whose location, construction, furnishing and equipping is also of like quality to that of the Golf Course are operated.

(k)    Fiscal Year.  Fiscal Year shall mean a calendar year, provided that the first Fiscal Year shall commence on the opening of the Golf Course and end on the next succeeding December 31 and, in the event of early termination of this Agreement, the last Fiscal Year shall end on the date of termination.

(l)    Food and Beverage Gross Revenue.  Food and Beverage Gross Revenue shall have the meaning set forth in Section 4.2(b)(1).

2

or hereafter may be applicable to the Golf Course (including any portion or department thereof) or the operation or maintenance thereof.

(v) Lending Rate. Lending Rate shall mean the rate of interest per annum equal to the lesser of: (1) at the rate of two percent (2%) per annum plus prime rate then being charged by Bank of Hawaii or (2) the maximum rate permitted by law, such rate of interest to be adjusted at the end of each month included in any period for which interest is charged hereunder.

(w) Mortgage. Mortgage shall mean that certain mortgage, if any, described in Exhibit A.

(x) Operating Accounts. Operating Accounts shall mean the bank accounts for the Golf Course described in Section 4.4.

(y) Operating Budget. Operating Budget shall have the meaning set forth in Section 5.1.

(z) Property. Property shall mean the real property described in Exhibit A attached hereto.

(aa) [Intentionally deleted]

(bb) Revenue. Revenue shall have the meaning set forth in Section 7.1(c).

(cc) Termination Fee. Termination Fee shall have the meaning set forth in Section 9.7.

## ARTICLE II

## NAME OF GOLF COURSE

2.1 Golf Course Name. The name of the Golf Course shall be determined by Owner prior to the Commencement Date. After the selection of such name, all operations of the Golf Course, including all marketing of the Golf Course, shall be under such name.

## ARTICLE III

## TERM

3.1 Original Term. This Agreement shall be effective on the Commencement Date hereof, the original operating term of this Agreement shall commence on the Commencement Date and shall continue until the end of the Fiscal Year in which the 20th anniversary of the

4

Commencement Date occurs, unless this Agreement shall be sooner terminated as herein provided.

3.2    Extension Terms. Operator shall not have any right to extend the operating term unless otherwise mutually agreed to in writing by both Operator and Owner..

ARTICLE IV

OPERATION OF THE GOLF COURSE

4.1    Exclusive Right to Manage; Standard of Operation.

(a)    Owner hereby grants to Operator the sole and exclusive right to manage and operate the Golf Course pursuant to the terms of this Agreement, and Operator agrees that, except to the extent excused as hereinafter provided, Operator will, as the agent of Owner, operate the Golf Course during the term of this Agreement in conformity with First Class Standards and in conformity with all of the terms, covenants and conditions herein contained, and shall use the Golf Course solely for the operation of a Golf Course business conforming to First Class Standards, and for other activities which are customary and usual in connection with such operations, including, without limitation, pro shop, driving range and restaurant operations. The parties agree that the agency and authority granted and conferred on Operator herein are powers coupled with an interest in the Golf Course and are irrevocable during the term of this Agreement. Except as otherwise specifically limited under this Agreement, Operator, as the sole and exclusive agent of Owner, shall (subject to compliance with the terms and covenants contained in this Agreement) have absolute authority, control and discretion in the operation of the Golf Course, including, without limitation, (1) the sole right, authority and power, either by itself or as part of an association, to negotiate and enter into such contracts (including, without limitation, collective bargaining agreements or labor contracts), leases, concession agreements, service agreements, and other agreements, in the name and at the expense of Owner as may be necessary or advisable in connection with the operation of the Golf Course, Owner hereby agreeing to execute any such lease, contract or agreement upon request of Operator, and (2) the sole right, authority and power to determine the terms of admittance, charges for services and commercial space, charges for entertainment, charges for ancillary services, charges for food and beverages (which rights shall specifically allow Operator to charge varying rates to different customers or groups of customers), labor policies (including wage rates, the hiring and discharging of employees, and the installation of employee retirement or other benefit plans), credit policies (including arrangements with credit card organizations) and all phases of advertising, promotion and publicity relating to the Golf Course. Except as otherwise provided herein, the right of Owner to receive an amount based on the financial returns from the operation of the Golf Course shall not be deemed to give Owner any interest, control or discretion in the operation of the Golf Course which is vested in Operator, as agent for Owner, pursuant to this Agreement.

5

for the Fiscal Year (or portion thereof) in which such termination occurs. If, for the last Fiscal Year, the aggregate amount of the installments paid to Operator for the Base Management Fee, and the Incentive Fee, if any, shall be more or less than the amount of such Fees payable for such Fiscal Year based upon the final determination of Gross Revenue, Adjusted Gross Operating Profit and Ancillary Gross Revenue for such Fiscal Year as reflected in the Annual Statement for such Fiscal Year provided for in Section 5.4, then, by way of year-end adjustment, within fifteen (15) days after the delivery of such Annual Statement to Owner, Operator shall pay to the Owner the amount of such overpayment or Owner shall pay to Operator the amount of such underpayment.

(b)     To the extent assignable, Operator shall assign and transfer to Owner all of Operator's right, title and interest in and to all liquor, restaurant and other licenses and permits, if any, with respect to the Golf Course; provided, however, if Operator has expended any of its own funds in the acquisition of such licenses or permits, Owner shall reimburse Operator therefor.

(c)     Operator shall peacefully vacate and surrender the Golf Course to Owner.

(d)     Owner shall indemnify, defend and hold Operator harmless from all costs, expenses, claims, damages and liabilities, including without limitation, counsel fees and disbursements, arising out of, in connection with or resulting from the ownership, operation or use of the Golf Course after the date of termination, including, without limitation, the failure of Owner following the expiration or earlier termination (for whatever cause) of this Agreement to provide all of the services contracted for in connection with the business booked for the Golf Course on or prior to the date of such expiration or termination. The provisions of this subsection (d) shall survive any such termination or expiration and shall be binding upon Owner, its successors and assigns, including any successor or assign who becomes the "Owner" after the effective date of any such expiration or termination.

9.6     [Intentionally deleted]

9.7     Termination Fee.

(a)     In the event of termination of this Agreement due to Owner's default and Operator's resultant termination of this Agreement as provided in Section 9.3, or in the event of destruction or condemnation of the Golf Course as provided in Article X, Owner shall pay to Operator a Termination Fee equal to the sum of Five Hundred Thousand Dollars ($500,000).

9.8     Termination Based on Performance. Owner shall have the right to terminate the Agreement with no obligation to pay the Termination Fee if the Operator's actual performance for two consecutive years fails to achieve the budgeted Gross Operating Income or the Gross Revenue within a ten (10) percent range, provided, however that the Owner shall not have the

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

OWNER:                                SPORTS SHINKO (MILILANI) CO., LTD.,
                                      a Hawaii corporation


                                      By: _Satoshi Kinoshita_
                                      Name: _Satoshi Kinoshita_
                                      Title: _Executive Vice President_


OPERATOR:                             RESORT MANAGEMENT SERVICES
                                      (HAWAII), INC., a Hawaii corporation


                                      By: _____
                                      Name: _Yasuo Nishida_
                                      Title: _President_


39

## HOTEL MANAGEMENT AGREEMENT

THIS HOTEL MANAGEMENT AGREEMENT is made and entered into as of the  31st  day of   August         ,   2000  , by and between SPORTS SHINKO (WAIKIKI) CORPORATION, dba QUEEN KAPIOLANI HOTEL ("Owner"), and RESORT MANAGEMENT SERVICES (HAWAII), INC., a Hawaii corporation ("Operator").

### RECITALS

This Agreement is made and entered into with the understanding by the parties of the following facts:

A.    Owner owns the Property and Hotel (hereinafter defined).

B.    Owner desires to retain, and Operator is prepared to provide to Owner, Operator's assistance and services, as Owner's agent, in managing, operating and promoting the Hotel for the account of Owner upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

DEFINITIONS

1.1    Definitions.  The following words and phrases as used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning and intent:

(a)    Accounting Period.  Accounting Period shall mean either of the following at the election of Operator, provided such election shall be consistently applied:

(1)    a full calendar month (or partial calendar month if at the beginning or end of the term hereof); or

(2)    each of the three (3) successive periods within a fiscal quarter, consisting of four (4) weeks, four (4) weeks and five (5) weeks, respectively.

(b)    Adjusted Gross Operating Profit.  Adjusted Gross Operating Profit shall have the meaning set forth in Section 7.1(b).


EXHIBIT 04
6
415-05
S. Kinoshita

(c)    Affiliate. An Affiliate of any person or entity shall mean any other person or entity which directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with, such person or entity.

(d)    Annual Projection. Annual Projection shall have the meaning set forth in Section 5.1.

(e)    Annual Statement. Annual Statement shall have the meaning set forth in Section 5.4.

(f)    Base Management Fee. Base Management Fee shall have the meaning set forth in Section 7.2.

(g)    Capital Budget. Capital Budget shall have the meaning set forth in Section 5.1.

(h)    CPI Adjuster. CPI Adjuster shall mean the percentage by which the CPI, at the time of application of the CPI Adjuster, exceeds the CPI in effect as of the end of the last full calendar month preceding the date of this Agreement. "CPI" shall mean the Consumer Price Index, United States City Average, All Urban Consumers, All Items, published from time to time by the United States Bureau of Labor Statistics. If the CPI is discontinued, a comparable index published by any governmental agency or recognized authority shall be used in place thereof, subject to the reasonable approval of Owner and Operator.

(i)    Commencement Date. Commencement Date shall mean September 1, 2000.

(j)    First Class Hotel Standards. First Class Hotel Standards shall mean the standards pursuant to which hotels comparable in size to the Hotel, offering the level and type of service available at the Hotel, and whose location, construction, furnishing and equipping is also of like quality to that of the Hotel, are operated.

(k)    Fiscal Year. Fiscal Year shall mean a calendar year, provided that the first Fiscal Year shall commence on the opening of the Hotel and end on the next succeeding December 31 and, in the event of early termination of this Agreement, the last Fiscal Year shall end on the date of termination.

(l)    Food and Beverage Gross Revenue. Food and Beverage Gross Revenue shall have the meaning set forth in Section 4.2(b)(1).

(m)    Force Majeure. Force Majeure shall mean strikes, lockouts, labor disputes, acts of God, fire, flood or other casualty, pestilence, war, civil strife, riot, embargo, shortages of labor or materials, governmental restrictions, emergency acts or any other

2

charged by Bank of Hawaii, or (2) the maximum rate permitted by law, such rate of interest to be adjusted at the end of each month included in any period for which interest is charged hereunder.

    (w)    Mortgage.  Mortgage shall mean that certain mortgage

    (x)    Operating Accounts.  Operating Accounts shall mean the bank accounts for the Hotel described in Section 4.4.

    (y)    Operating Budget.  Operating Budget shall have the meaning set forth in Section 5.1.

    (z)    Property.  Property shall mean the real property described in Exhibit A attached hereto.

    (aa)    [Intentionally deleted].

    (bb)    Rooms Revenue.  Rooms Revenue shall have the meaning set forth in Section 7.1(c).

    (cc)    Termination Fee.  Termination Fee shall have the meaning set forth in Section 9.6.

    (dd)    Uniform System.  Uniform System shall mean the "Uniform System of Accounts for Hotels" (8th Revised Edition, 1986) of the Hotel Association of New York City, as approved by the American Hotel & Motel Association and as revised from time to time, as the same may apply to resort hotels.

## ARTICLE II

## NAME OF HOTEL

    2.1    Hotel Name.  The name of the Hotel shall be determined by Owner prior to the Commencement Date.  After the selection of such name, all operations of the Hotel, including all marketing of the Hotel, shall be under such names.

## ARTICLE III

## TERM

    3.1    Original Term.  This Agreement shall be effective on the Commencement Date hereof, the original operating term of this Agreement shall commence on the Commencement

4

Date and shall continue until the end of the Fiscal Year in which the 20th anniversary of the Commencement Date occurs, unless this Agreement shall be sooner terminated as herein provided.

      3.2    Extension Terms. Operator shall not have any right to extend the operating term unless otherwise mutually agreed to in writing by both Operator and Owner.

## ARTICLE IV

## OPERATION OF THE HOTEL

      4.1    Exclusive Right to Manage; Standard of Operation.

      (a)    Owner hereby grants to Operator the sole and exclusive right to manage and operate the Hotel pursuant to the terms of this Agreement, and Operator agrees that, except to the extent excused as hereinafter provided, Operator will, as the agent of Owner, operate the Hotel during the term of this Agreement in conformity with First Class Hotel Standards and in conformity with all of the terms, covenants and conditions herein contained, and shall use the Hotel solely for the operation of a hotel business conforming to First Class Hotel Standards, and for other activities which are customary and usual in connection with such operations. The parties agree that the agency and authority granted and conferred on Operator herein are powers coupled with an interest in the Hotel and are irrevocable during the term of this Agreement. Except as otherwise specifically limited under this Agreement, Operator, as the sole and exclusive agent of Owner, shall (subject to compliance with the terms and covenants contained in this Agreement) have absolute authority, control and discretion in the operation of the Hotel, including, without limitation, (1) the sole right, authority and power, either by itself or as part of an association, to negotiate and enter into such contracts (including, without limitation, collective bargaining agreements or labor contracts), leases, concession agreements, service agreements, and other agreements, in the name and at the expense of Owner as may be necessary or advisable in connection with the operation of the Hotel, Owner hereby agreeing to execute any such lease, contract or agreement upon request of Operator, and (2) the sole right, authority and power to determine the terms of admittance, charges for rooms and commercial space, charges for entertainment, charges for food and beverages (which rights shall specifically allow Operator to charge varying rates to different customers or groups of customers), labor policies (including wage rates, the hiring and discharging of employees, and the installation of employee retirement or other benefit plans), credit policies (including arrangements with credit card organizations) and all phases of advertising, promotion and publicity relating to the Hotel. Except as otherwise provided herein, the right of Owner to receive an amount based on the financial returns from the operation of the Hotel shall not be deemed to give Owner any interest, control or discretion in the operation of the Hotel which is vested in Operator, as agent for Owner, pursuant to this Agreement.

5

survive any such termination or expiration and shall be binding upon Owner, its successors and assigns, including any successor or assign who becomes the "Owner" after the effective date of any such expiration or termination.

9.6     Termination Fee.

(a)     In the event of termination of this Agreement due to Owner's default and Operator's resultant termination of this Agreement as provided in Section 9.3, or in the event of destruction or condemnation of the Hotel as provided in Article X, Owner shall pay to Operator a Termination Fee equal to the sum of One Million Dollars ($1,000,000).

9.7     Owner shall have the right to terminate the Agreement with no obligation to pay the Termination Fee if the Operator's actual performance for two consecutive years fails to achieve the budgeted Gross Operating Income or the Gross Revenue within a ten (10) percent range, provided, however that the Owner shall not have the right to terminate the Agreement under this paragraph 9.7 for the first five (5) years of the initial term of the Agreement except for a default of Operator other than this paragraph 9.7.

ARTICLE X

DESTRUCTION AND CONDEMNATION

10.1     Substantial Damage. If the Hotel shall be destroyed or substantially damaged by fire or other casualty, either party may, within sixty (60) days after the occurrence of such event, give notice to the other terminating this Agreement. For purposes of this Section 10.1, the Hotel shall be deemed to have been substantially damaged if either (a) the estimated cost of the restoration shall exceed forty-five percent (45%) of the estimated cost (excluding foundation, footing and excavation cost) of replacing the Hotel by constructing, furnishing and equipping, in accordance with the Legal Requirements and Insurance Requirements then in effect, a new hotel on the Property which shall be substantially the same as the Hotel, as it was immediately prior to such casualty (or if such casualty shall occur prior to the Opening Date, forty-five percent (45%) of such cost of constructing, furnishing and equipping the Hotel in accordance with the final plans and specifications therefor) or (b) the length of time required for restoration shall be in excess of thirty (30) months from the date of such casualty. The proceeds of any business interruption insurance shall be allocated between the parties as their interests may appear, provided, however, that the amount payable to Operator under this Section 10.1 shall not exceed the amount of the Termination Fee calculated as of the Fiscal Year in which the damage occurs. In the event that Owner does not have the right to terminate this Agreement pursuant to this Section 10.1, Owner shall use the proceeds of any property damage insurance to promptly rebuild the Hotel, and shall pay any costs of rebuilding not covered by insurance out of its own funds. Otherwise, the proceeds of any property insurance may be retained by Owner as its own property, subject, in the event of termination of this Agreement, to the provisions of

26

13.24  Further Assurances.  The parties hereto agree to execute, acknowledge, deliver and record such certificates, amendments, instruments and documents, and to take such other action, as may be necessary to carry out the intent and purposes of this Agreement.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

OWNER:                          SPORTS SHINKO (WAIKIKI) CORPORATION,
                                dba QUEEN KAPIOLANI HOTEL


                                By:  _Satoshi Kinoshita_
                                     Name:  Satoshi Kinoshita
                                     Title:  Executive Vice President



OPERATOR:                       RESORT MANAGEMENT SERVICES
                                (HAWAII), INC.


                                By:  _Yasuo Nishida_
                                     Name:  Yasuo Nishida
                                     Title:  President

39

## GOLF COURSE MANAGEMENT AGREEMENT

THIS GOLF COURSE MANAGEMENT AGREEMENT is made and entered into as of the 31st day of August, 2000, by and between SPORTS SHINKO (KAUAI) CO., LTD., a Hawaii corporation, dba KIAHUNA GOLF COURSE ("Owner"), and RESORT MANAGEMENT SERVICES (HAWAII), INC., a Hawaii corporation ("Operator").

### RECITALS

This Agreement is made and entered into with the understanding by the parties of the following facts:

A.    Owner owns the Property and Golf Course (hereinafter defined).

B.    Owner desires to retain, and Operator is prepared to provide to Owner, Operator's assistance and services, as Owner's agent, in managing, operating and promoting the Golf Course for the account of Owner upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

DEFINITIONS

1.1    Definitions. The following words and phrases as used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning and intent:

(a)    Accounting Period. Accounting Period shall mean either of the following at the election of Operator, provided such election shall be consistently applied:

(1)    a full calendar month (or partial calendar month if at the beginning or end of the term hereof); or

(2)    each of the three (3) successive periods within a fiscal quarter, consisting of four (4) weeks, four (4) weeks and five (5) weeks, respectively.



EXHIBIT 01
7  4-19-05
S. Kinoshita

(b)     Adjusted Gross Operating Profit. Adjusted Gross Operating Profit shall have the meaning set forth in Section 7.1(b).

(c)     Affiliate. An Affiliate of any person or entity shall mean any other person or entity which directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with, such person or entity.

(d)     Annual Projection. Annual Projection shall have the meaning set forth in Section 5.1.

(e)     Annual Statement. Annual Statement shall have the meaning set forth in Section 5.4.

(f)     Base Management Fee. Base Management Fee shall have the meaning set forth in Section 7.2.

(g)     Capital Budget. Capital Budget shall have the meaning set forth in Section 5.1.

(h)     CPI Adjuster. CPI Adjuster shall mean the percentage by which the CPI, at the time of application of the CPI Adjuster, exceeds the CPI in effect as of the end of the last full calendar month preceding the date of this Agreement. "CPI" shall mean the Consumer Price Index, United States City Average, All Urban Consumers, All Items, published from time to time by the United States Bureau of Labor Statistics. If the CPI is discontinued, a comparable index published by any governmental agency or recognized authority shall be used in place thereof, subject to the reasonable approval of Owner and Operator.

(i)     Commencement Date. Commencement Date shall mean September 1, 2000.

(j)     First Class Standards. First Class Standards shall mean the standards pursuant to which golf courses comparable to the Golf Course, offering the level and type of service available at the Golf Course and whose location, construction, furnishing and equipping is also of like quality to that of the Golf Course are operated.

(k)     Fiscal Year. Fiscal Year shall mean a calendar year, provided that the first Fiscal Year shall commence on the opening of the Golf Course and end on the next succeeding December 31 and, in the event of early termination of this Agreement, the last Fiscal Year shall end on the date of termination.

(l)     Food and Beverage Gross Revenue. Food and Beverage Gross Revenue shall have the meaning set forth in Section 4.2(b)(1).

2

or hereafter may be applicable to the Golf Course (including any portion or department thereof) or the operation or maintenance thereof.

(v)     Lending Rate.  Lending Rate shall mean the rate of interest per annum equal to the lesser of:  (1) at the rate of two percent (2%) per annum plus prime rate then being charged by Bank of Hawaii or (2) the maximum rate permitted by law, such rate of interest to be adjusted at the end of each month included in any period for which interest is charged hereunder.

(w)     Mortgage.  Mortgage shall mean that certain mortgage, if any, described in Exhibit A.

(x)     Operating Accounts.  Operating Accounts shall mean the bank accounts for the Golf Course described in Section 4.4.

(y)     Operating Budget.  Operating Budget shall have the meaning set forth in Section 5.1.

(z)     Property.  Property shall mean the real property described in Exhibit A attached hereto.

(aa)    [Intentionally deleted]

(bb)    Revenue.  Revenue shall have the meaning set forth in Section 7.1(c).

(cc)    Termination Fee.  Termination Fee shall have the meaning set forth in Section 9.7.

## ARTICLE II

## NAME OF GOLF COURSE

2.1     Golf Course Name.  The name of the Golf Course shall be determined by Owner prior to the Commencement Date.  After the selection of such name, all operations of the Golf Course, including all marketing of the Golf Course, shall be under such name.

## ARTICLE III

## TERM

3.1     Original Term.  This Agreement shall be effective on the Commencement Date hereof, the original operating term of this Agreement shall commence on the Commencement Date and shall continue until the end of the Fiscal Year in which the 20th anniversary of the

4

Commencement Date occurs, unless this Agreement shall be sooner terminated as herein provided.

      3.2     Extension Terms. Operator shall not have any right to extend the operating term unless otherwise mutually agreed to in writing by both Operator and Owner.

ARTICLE IV

OPERATION OF THE GOLF COURSE

      4.1     Exclusive Right to Manage; Standard of Operation.

      (a)     Owner hereby grants to Operator the sole and exclusive right to manage and operate the Golf Course pursuant to the terms of this Agreement, and Operator agrees that, except to the extent excused as hereinafter provided, Operator will, as the agent of Owner, operate the Golf Course during the term of this Agreement in conformity with First Class Standards and in conformity with all of the terms, covenants and conditions herein contained, and shall use the Golf Course solely for the operation of a Golf Course business conforming to First Class Standards, and for other activities which are customary and usual in connection with such operations, including, without limitation, pro shop, driving range and restaurant operations. The parties agree that the agency and authority granted and conferred on Operator herein are powers coupled with an interest in the Golf Course and are irrevocable during the term of this Agreement. Except as otherwise specifically limited under this Agreement, Operator, as the sole and exclusive agent of Owner, shall (subject to compliance with the terms and covenants contained in this Agreement) have absolute authority, control and discretion in the operation of the Golf Course, including, without limitation, (1) the sole right, authority and power, either by itself or as part of an association, to negotiate and enter into such contracts (including, without limitation, collective bargaining agreements or labor contracts), leases, concession agreements, service agreements, and other agreements, in the name and at the expense of Owner as may be necessary or advisable in connection with the operation of the Golf Course, Owner hereby agreeing to execute any such lease, contract or agreement upon request of Operator, and (2) the sole right, authority and power to determine the terms of admittance, charges for services and commercial space, charges for entertainment, charges for ancillary services, charges for food and beverages (which rights shall specifically allow Operator to charge varying rates to different customers or groups of customers), labor policies (including wage rates, the hiring and discharging of employees, and the installation of employee retirement or other benefit plans), credit policies (including arrangements with credit card organizations) and all phases of advertising, promotion and publicity relating to the Golf Course. Except as otherwise provided herein, the right of Owner to receive an amount based on the financial returns from the operation of the Golf Course shall not be deemed to give Owner any interest, control or discretion in the operation of the Golf Course which is vested in Operator, as agent for Owner, pursuant to this Agreement.

5

for the Fiscal Year (or portion thereof) in which such termination occurs. If, for the last Fiscal Year, the aggregate amount of the installments paid to Operator for the Base Management Fee, and the Incentive Fee, if any, shall be more or less than the amount of such Fees payable for such Fiscal Year based upon the final determination of Gross Revenue, Adjusted Gross Operating Profit and Ancillary Gross Revenue for such Fiscal Year as reflected in the Annual Statement for such Fiscal Year provided for in Section 5.4, then, by way of year-end adjustment, within fifteen (15) days after the delivery of such Annual Statement to Owner, Operator shall pay to the Owner the amount of such overpayment or Owner shall pay to Operator the amount of such underpayment.

(b)     To the extent assignable, Operator shall assign and transfer to Owner all of Operator's right, title and interest in and to all liquor, restaurant and other licenses and permits, if any, with respect to the Golf Course; provided, however, if Operator has expended any of its own funds in the acquisition of such licenses or permits, Owner shall reimburse Operator therefor.

(c)     Operator shall peacefully vacate and surrender the Golf Course to Owner.

(d)     Owner shall indemnify, defend and hold Operator harmless from all costs, expenses, claims, damages and liabilities, including without limitation, counsel fees and disbursements, arising out of, in connection with or resulting from the ownership, operation or use of the Golf Course after the date of termination, including, without limitation, the failure of Owner following the expiration or earlier termination (for whatever cause) of this Agreement to provide all of the services contracted for in connection with the business booked for the Golf Course on or prior to the date of such expiration or termination. The provisions of this subsection (d) shall survive any such termination or expiration and shall be binding upon Owner, its successors and assigns, including any successor or assign who becomes the "Owner" after the effective date of any such expiration or termination.

9.6     [Intentionally deleted]

9.7     Termination Fee.

(a)     In the event of termination of this Agreement due to Owner's default and Operator's resultant termination of this Agreement as provided in Section 9.3, or in the event of destruction or condemnation of the Golf Course as provided in Article X, Owner shall pay to Operator a Termination Fee equal to the sum of Five Hundred Thousand Dollars ($500,000).

9.8     Termination Based on Performance. Owner shall have the right to terminate the Agreement with no obligation to pay the Termination Fee if the Operator's actual performance for two consecutive years fails to achieve the budgeted Gross Operating Income or the Gross Revenue within a ten (10) percent range, provided, however that the Owner shall not have the

25

IN WITNESS WHEREOF, the parties hereto have executed this Agreement as of the date first set forth above.

OWNER:                           SPORTS SHINKO (KAUAI) CO., LTD.,
                                 a Hawaii corporation, dba KIAHUNA GOLF
                                 COURSE

                                 By: _Satoshi Kinoshita_
                                    Name: Satoshi Kinoshita
                                    Title: Executive Vice President


OPERATOR:                        RESORT MANAGEMENT SERVICES
                                 (HAWAII), INC., a Hawaii corporation


                                 By: _____
                                    Name: Yasuo Nishida
                                    Title: President

39

## HOTEL MANAGEMENT AGREEMENT

THIS HOTEL MANAGEMENT AGREEMENT is made and entered into as of the 31st day of ___August___, 2000___, by and between SPORTS SHINKO (WAIKIKI) CORPORATION, dba OCEAN RESORT HOTEL WAIKIKI ("Owner"), and RESORT MANAGEMENT SERVICES (HAWAII), INC., a Hawaii corporation ("Operator").

### RECITALS

This Agreement is made and entered into with the understanding by the parties of the following facts:

A.    Owner owns the Property and Hotel (hereinafter defined).

B.    Owner desires to retain, and Operator is prepared to provide to Owner, Operator's assistance and services, as Owner's agent, in managing, operating and promoting the Hotel for the account of Owner upon the terms and conditions hereinafter set forth.

### AGREEMENT

NOW, THEREFORE, in consideration of the premises and of the mutual covenants herein contained, the parties hereto hereby agree as follows:

### ARTICLE I

DEFINITIONS

1.1    Definitions. The following words and phrases as used in this Agreement shall have the following meanings unless the context or use indicates another or different meaning and intent:

(a)    Accounting Period. Accounting Period shall mean either of the following at the election of Operator, provided such election shall be consistently applied:

(1)    a full calendar month (or partial calendar month if at the beginning or end of the term hereof); or

(2)    each of the three (3) successive periods within a fiscal quarter, consisting of four (4) weeks, four (4) weeks and five (5) weeks, respectively.

(b)    Adjusted Gross Operating Profit. Adjusted Gross Operating Profit shall have the meaning set forth in Section 7.1(b).



EXHIBIT
8    B1
4-15-05
S. Kinoshita

(c)      Affiliate. An Affiliate of any person or entity shall mean any other person or entity which directly or indirectly, through one or more intermediaries controls, is controlled by, or is under common control with, such person or entity.

(d)      Annual Projection. Annual Projection shall have the meaning set forth in Section 5.1.

(e)      Annual Statement. Annual Statement shall have the meaning set forth in Section 5.4.

(f)      Base Management Fee. Base Management Fee shall have the meaning set forth in Section 7.2.

(g)      Capital Budget. Capital Budget shall have the meaning set forth in Section 5.1.

(h)      CPI Adjuster. CPI Adjuster shall mean the percentage by which the CPI, at the time of application of the CPI Adjuster, exceeds the CPI in effect as of the end of the last full calendar month preceding the date of this Agreement. "CPI" shall mean the Consumer Price Index, United States City Average, All Urban Consumers, All Items, published from time to time by the United States Bureau of Labor Statistics. If the CPI is discontinued, a comparable index published by any governmental agency or recognized authority shall be used in place thereof, subject to the reasonable approval of Owner and Operator.

(i)      Commencement Date. Commencement Date shall mean September 1, 2000

(j)      First Class Hotel Standards. First Class Hotel Standards shall mean the standards pursuant to which hotels comparable in size to the Hotel, offering the level and type of service available at the Hotel, and whose location, construction, furnishing and equipping is also of like quality to that of the Hotel, are operated.

(k)      Fiscal Year. Fiscal Year shall mean a calendar year, provided that the first Fiscal Year shall commence on the opening of the Hotel and end on the next succeeding December 31 and, in the event of early termination of this Agreement, the last Fiscal Year shall end on the date of termination.

(l)      Food and Beverage Gross Revenue. Food and Beverage Gross Revenue shall have the meaning set forth in Section 4.2(b)(1).

(m)      Force Majeure. Force Majeure shall mean strikes, lockouts, labor disputes, acts of God, fire, flood or other casualty, pestilence, war, civil strife, riot, embargo, shortages of labor or materials, governmental restrictions, emergency acts or any other

charged by Bank of Hawaii, or (2) the maximum rate permitted by law, such rate of interest to be adjusted at the end of each month included in any period for which interest is charged hereunder.

      (w)    Mortgage.  Mortgage shall mean that certain mortgage

      (x)    Operating Accounts.  Operating Accounts shall mean the bank accounts for the Hotel described in Section 4.4.

      (y)    Operating Budget.  Operating Budget shall have the meaning set forth in Section 5.1.

      (z)    Property.  Property shall mean the real property described in Exhibit A attached hereto.

      (aa)    [Intentionally deleted].

      (bb)    Rooms Revenue.  Rooms Revenue shall have the meaning set forth in Section 7.1(c).

      (cc)    Termination Fee.  Termination Fee shall have the meaning set forth in Section 9.6.

      (dd)    Uniform System.  Uniform System shall mean the "Uniform System of Accounts for Hotels" (8th Revised Edition, 1986) of the Hotel Association of New York City, as approved by the American Hotel & Motel Association and as revised from time to time, as the same may apply to resort hotels.

## ARTICLE II

## NAME OF HOTEL

      2.1    Hotel Name.  The name of the Hotel shall be determined by Owner prior to the Commencement Date.  After the selection of such name, all operations of the Hotel, including all marketing of the Hotel, shall be under such names.

## ARTICLE III

## TERM

      3.1    Original Term.  This Agreement shall be effective on the Commencement Date hereof, the original operating term of this Agreement shall commence on the Commencement

4

Date and shall continue until the end of the Fiscal Year in which the 20th anniversary of the Commencement Date occurs, unless this Agreement shall be sooner terminated as herein provided.

      3.2     Extension Terms.  Operator shall not have any right to extend the operating term unless otherwise mutually agreed to in writing by both Operator and Owner.

ARTICLE IV

OPERATION OF THE HOTEL

      4.1     Exclusive Right to Manage; Standard of Operation.

      (a)     Owner hereby grants to Operator the sole and exclusive right to manage and operate the Hotel pursuant to the terms of this Agreement, and Operator agrees that, except to the extent excused as hereinafter provided, Operator will, as the agent of Owner, operate the Hotel during the term of this Agreement in conformity with First Class Hotel Standards and in conformity with all of the terms, covenants and conditions herein contained, and shall use the Hotel solely for the operation of a hotel business conforming to First Class Hotel Standards, and for other activities which are customary and usual in connection with such operations.  The parties agree that the agency and authority granted and conferred on Operator herein are powers coupled with an interest in the Hotel and are irrevocable during the term of this Agreement. Except as otherwise specifically limited under this Agreement, Operator, as the sole and exclusive agent of Owner, shall (subject to compliance with the terms and covenants contained in this Agreement) have absolute authority, control and discretion in the operation of the Hotel, including, without limitation, (1) the sole right, authority and power, either by itself or as part of an association, to negotiate and enter into such contracts (including, without limitation, collective bargaining agreements or labor contracts), leases, concession agreements, service agreements, and other agreements, in the name and at the expense of Owner as may be necessary or advisable in connection with the operation of the Hotel, Owner hereby agreeing to execute any such lease, contract or agreement upon request of Operator, and (2) the sole right, authority and power to determine the terms of admittance, charges for rooms and commercial space, charges for entertainment, charges for food and beverages (which rights shall specifically allow Operator to charge varying rates to different customers or groups of customers), labor policies (including wage rates, the hiring and discharging of employees, and the installation of employee retirement or other benefit plans), credit policies (including arrangements with credit card organizations) and all phases of advertising, promotion and publicity relating to the Hotel.  Except as otherwise provided herein, the right of Owner to receive an amount based on the financial returns from the operation of the Hotel shall not be deemed to give Owner any interest, control or discretion in the operation of the Hotel which is vested in Operator, as agent for Owner, pursuant to this Agreement.

5