### Eric Kawatani - Offer to Purchase; Kiahuna; Pukalani

**From:** "Douglas A. Pothul, CCIM, SIOR" <doug@pothul.com>
**To:** "Satoshi Kinoshita" <satoshi@sportsshinkohawaii.com>
**Date:** 11/15/2001 11:11 AM
**Subject:** Offer to Purchase; Kiahuna; Pukalani

Dr. Kinoshita,

Attached (tif file) is an offer for Sports Shinko's consideration. Below are some highlights:

Buyer: Ron Allred

Term: All cash, no financing

Deposit: $1 million NON-refundable immediatly

Closing: December 17, 2001

Property: (1) Pukalani – all assets (golf, land, sewer treatment)
(2) Kiahuna – only the golf course asset, including the 9-hole expansion, but NOT the residential development land)

Price: $11 million

Option: To purchase Mililani Country Club for $8.0 million

*******************

Please note that the portions of Kiahuna not desired by Mr. Allred are those that Moshe Silage made an offer on the other week.

Also note, we have not heard back from Smith Development on Pukalani.

After your review, let's discuss.

Aloha,

Doug

Douglas A. Pothul, CCIM, SIOR
Colliers Monroe Friedlander, Inc.
808.523.9725

doug@pothul.com

doug@colliershawaii.com

EXHIBIT B4
48 4-24-05
S. Kinoshita

083 1541

file://C:\Documents%20and%20Settings\ms\Local%20Settings\Temp\GW}00001.HTM    10/30/2003



EXHIBIT 9

http://pothul.com
www.colliershawaii.com

For my complete contact information, please go to:

http://pothul.com/pg/c_i.html

08/31/2001  03:15   9089519141              ALLRED                       PAGE  02

PROPERTY ACQUISITION AGREEMENT

This Agreement is made as of this 14th day of November, 2001, by and between Sports Shinko Hawaii, Inc.("Seller"), and Mr. Ronald D. Allred individually or Assigns, whose principal place of business is 5734 East Rancho Manana Blvd., Cave Creek, Arizona 85331 ("Buyer")

RECITALS

I. Seller is the owner in fee simple of those certain properties described below.

II. Buyer wishes to acquire all of Seller's fee simple right, title and interest in such properties from Seller upon the terms, covenants and conditions set forth below.

AGREEMENT

NOW THEREFORE, for and in consideration of the mutual promises and covenants contained herein, and other good and valuable consideration, receipt of which is hereby acknowledged, Buyer hereby agrees to purchase the Properties (as defined below) from Seller and Seller hereby agrees to sell, transfer and convey the Property to Buyer subject to the following terms and provisions:

1. Property. The properties that are the subject of this Agreement (collectively referred to as the "Properties") are comprised of the following

   Pukalani Country Club: All assets (including Pukalani Sewage Treatment Plant and all water & effluent rights) comprised of the following Tax Map Key Numbers:
   
   Division 2, Zone 2, Section 3
   
   Plat 8, Parcels 5 & 36             Plat 55, Parcels 68, 69 & 88
   Plat 9, Parcels 4 & 39             Plat 56, Parcels 50, 97 & 98
   Plat 47, Parcel 126                Plat 57, Parcels 121, 123, 124, & 138
   Plat 48, Parcel 125                Plat 61, Parcels 1, 4 & 116
   Plat 49, Parcel 88

Seller represents and warrants that the above listed properties comprise of all of the remaining assets owned by the Seller and which constitute the Pukalani Country Club, The Pukalani Sewage Treatment Plant, the A-1 zoned apartment site, the Duplex zoned site and the Hotel zoned site.

General:385975.3

083 1543

may arise from Buyer's release of any information or documents in violation of this provision. This provisions shall survive the Closing.

30. **Entire Agreement.** This Agreement constitutes and contains the entire agreement between Seller and Buyer and supersedes any and all prior negotiations, correspondence, understandings and agreements between the parties regarding the subject matter hereof.

31. **Amendment.** This Agreement may be amended or modified only by a writing signed by both parties hereto.

32. **Counterparts.** This Agreement may be executed in counterparts, each of which so executed shall, irrespective of the date of its execution and delivery, be deemed an original, and said counterparts together shall constitute one and the same instrument.

33. **Holidays and Weekends.** If the time for the occurrence of any event or the performance of any act under this Agreement falls on a holiday or a weekend the time for such occurrence or performance shall automatically be postponed to the next business day.

34. **Corporate Authority.** This Agreement shall be executed by at least one corporate officer of both Buyer and Seller. Upon such execution, this Agreement shall become a binding agreement between the two parties.

35. **Option to Purchase Mililani Country Club, Island of Oahu :** (All assets including Furniture, Fixtures and Equipment, fee simple title and interest in the lands, the improvements thereon)

In addition to the above defined real property, the Buyer shall have a (120) calendar day Option to Purchase all Assets of the Mililani Country Club on the island Oahu for a predetermined price of $8,000,000.00. During the 120-day option period, Buyer shall perform the necessary due diligence review and apply for financing for the acquisition thereof, it being understood that the Buyer has not had the opportunity to review any materials relevant to the purchase thereof, nor has the Buyer reviewed any current operating statements thereof.

On or before December 1st, 2001, Seller shall provide Buyer with Operating Statement summaries for the past 3-years and monthly operating statements for the trailing 12-month period from the acceptance date hereof. During the Buyers Due diligence period, Seller shall make available to Buyer any and all documents that would constitute normal due diligence materials for Buyers review.

In the event the Buyer elects to proceed with the transaction on or before the expiration of the 120-day period, Buyer shall deposit $1,000,000.00 into escrow as a nonrefundable deposit and close 30-days thereafter.

16

083 1558

a.  Fee Simple Interests in the Real Property. All of Seller's right, title and interest in and to the fee simple estates in those certain parcels of real property as herein, including all buildings and other improvements located thereon (the "Real Property").

b.  Licenses and Contracts. All licenses, (including liquor licenses) contracts, permits and trade names or trademarks utilized in connection with the Properties which are capable of being assigned ("Licenses").

(i). Any current golf course management contracts in place for any of the three country clubs, shall be cancelled upon closing of escrow.

c.  Permits. All of Seller's right, title and interest in and to all licenses, approvals and permits issued by any public, quasi-public or governmental authority affecting the Properties ("Permits") which are capable of being assigned.

d.  Personal Property. All of Seller's right, title and interest in and to the following:

i.  All furniture, fixtures, equipment, appliances, machinery, tools, and other personal property located on and used in connection with the Properties.

ii.  All books of account for the Properties located in the Owners Office as described herein subject, however, to the right of Seller to retain, at its discretion, the original or copies of these books of account to satisfy its own accounting and tax reporting requirements.

iii.  All existing architectural plans, drawings, tracings, property surveys, topographical maps, improvement surveys, engineering reports, environmental reports and specifications for improvements built on the Real Property.

36.  Title: (Mililani Country Club)

a.  Good Title/Permitted Exceptions. At Closing (as herein below defined), Seller shall deliver to Buyer fee simple title to the Property, free and clear of all liens and encumbrances whatsoever except the following (herein referred to as the "Permitted Exceptions"):

i.  Those shown in the Title Report dated after the acceptance of this offer prepared by Title Guaranty of Hawaii Incorporated ("Title Company") (which Buyer shall have the right to disapprove during the Due Diligence Period), subject to such modifications as the Title Company or Buyer shall approve prior to the Closing Date;

ii.  Those as disclosed to and approved in writing by Buyer.

b.  Title Insurance Policy. Prior to Closing, Seller shall obtain a commitment ("Title Commitment") from the Title Company to deliver to Buyer at the Closing a standard

17

083 1559

Owner's Policy of Title Insurance with extended coverage ("Title Policy") providing title insurance coverage to Buyer, with liability limits in an amount equal to the Purchase Price and showing good, marketable and indefeasible title to the Land to be vested in Buyer subject only to the Permitted Exceptions. Buyer may, at its sole expense, request special coverage endorsements to be included in the Title Policy being issued by the Title Company at the time of Closing. The inability of the Title Company to issue the same shall not affect Buyer's obligation to close.

37. All Buyer and Seller representation and warranty provisions stated within the agreement for the acquisition of the Pukalani and Kiahuna Country Clubs shall also apply under the Option to Purchase the Mililani Country Club.

38. This offer, unless accepted by the Seller on or before November 21st, 2001, shall become null and void and of no further force and effect.

38. For tax purposes, Buyer shall have the right, through escrow, to allocate the purchase prices between the respective assets and the Seller shall acknowledge in writing the allocations thereof.

IN WITNESS WHEREOF, Seller and Buyer have entered into this Agreement as of the date and year first above written.

Mr. Ronald D. Allred or Assigns -         Buyer

By _____Ronald D. Allred_____
   Its

By _____
   Its


Sports Shinko Hawaii, Inc.              Seller

By _____
   Its


By _____
   Its

18

083 1560

***ATTORNEY-CLIENT PRIVILEGE***                196

```
 1              IN THE CIRCUIT COURT OF THE FIRST CIRCUIT
 2                          STATE OF HAWAII
 3    ------------------------------------
 4    SPORTS SHINKO (USA) CO., LTD., a Delaware
 5    Corporation; SPORTS SHINKO (MILILANI)
 6    CO., LTD., a Hawaii corporation, et al.,
 7              Plaintiff,
 8         vs.              Case No. 02-1-2766-11 (EEH)
 9    RESORT MANAGEMENT SERVICES
10    (HAWAII), INC., a Hawaii corporation,
11    YASUO NISHIDA, SATOSHI KINOSHITA, et al.
12              Defendants.
13    ------------------------------------
14
15              DEPOSITION OF SATOSHI KINOSHITA
16                         (Volume III)
17
18    Taken on behalf of the Plaintiff at Alston Hunt Floyd &
19    Ing, 1001 Bishop St., ASB Tower, 18th Floor, Honolulu,
20    Hawaii 96813, commencing at 9:00 a.m., Thursday, April
21    21, 2005, pursuant to Notice.
22
23    BEFORE:    BARBARA ACOBA, CSR No. 412, RPR
24               Notary Public, State of Hawaii
25
```

***ATTORNEY-CLIENT PRIVILEGE***                              197

```
 1    APPEARANCES:
 2    For Plaintiff:         GLENN MELCHINGER, Esq.
 3                           ALSTON HUNT FLOYD & ING
 4                           ASB Tower
 5                           1001 Bishop St., 18th Floor
 6                           Honolulu, Hawaii 96813
 7
 8    For Defendant SATOSHI KINOSHITA:
 9                           JOHN KOMEIJI, Esq.
10                           WATANABE ING KAWASHIMA & KOMEIJI
11                           First Hawaiian Center
12                           999 Bishop St., 23rd Floor
13                           Honolulu, Hawaii 96813
14
15
16    Also Present:          STEVEN SILVER - Interpreter
17
18
19
20
21
22
23
24
25
```

1  it came in to you, on or around November 9, 2001?
2      A.   Yes.
3      Q.   Had Mr. Silagi been making offers prior to
4  this; do you recall?
5      A.   Yes.  I do believe we had been contacted by
6  Mr. Moshe Silagi through another broker prior to that.
7      Q.   Did Sports Shinko make -- well, let me back up.
8  Page one of Exhibit 47, Mr. Pothul has recommended on
9  behalf of Colliers that Sports Shinko make a
10 counteroffer; is that right?
11     A.   Yes.
12     Q.   Do you remember if Sports Shinko made a
13 counteroffer or responded to this offer from Mr. Silagi
14 in any way?
15     A.   As I recall, this offer was also communicated
16 to the president and the president indicated that the
17 price being offered was too low, that it wasn't going to
18 go anywhere and that it ended there.
19     Q.   So same question as before:  Sports Shinko, as
20 far as you recall, did not ask Mr. Silagi for more
21 details or whether they would assume the management
22 contract for Sports Shinko Kauai with RMS or any other
23 details; is that right?
24     A.   I believe so.
25          MR. MELCHINGER:  This is Exhibit 48.

```
 1              (Exhibit 48 marked for identification.)
 2     BY MR. MELCHINGER:
 3          Q.   Showing you what's been marked Exhibit 48 to
 4     your deposition.  When you've had a chance to review it,
 5     could you tell me whether you recognize this document,
 6     please.
 7          A.   Yes, I do recognize this.
 8          Q.   So you recognize this as an e-mail to you from
 9     Mr. Pothul, dated November 15, 2001?
10          A.   Yes.
11          Q.   Did you read it on or about the day that it was
12     sent?  By which I mean November 15, 2001.
13          A.   Yes.  I read it and following the typical
14     protocol, I relayed it to Fukuda, and what I mean by
15     that is I relayed the information, that is the terms, to
16     Mr. Fukuda.
17          Q.   Again, for this property, or for this offer
18     from Mr. Allred, was Colliers the one who was handling
19     dealing with Mr. Allred; is that right?
20          A.   Yes.  However, prior to the time that this
21     offer was submitted, I met with Mr. Allred on the island
22     of Maui along with a Mr. Scott Mitchell who was with
23     Colliers and I spoke with Mr. Allred there.
24          Q.   Mitchell is M-i-t-c-h-e-l-l, and two Ts.  What
25     was the substance of your discussion with Mr. Allred and
```

1   Mr. Mitchell?

2       A.   Mr. Allred was a developer with some two
3   decades of experience in doing development work on the
4   Mainland.  He was involved with a ski resort together
5   with someone from Japan and he said that as a result, he
6   was used to dealing with Japanese companies.  As far as
7   why he was interested in the property, Mr. Allred noted
8   that he was interested in Maui because he came there
9   often and that he wanted to own a property on the
10  island.  And he said given the fact that he was a
11  professional developer, that he wanted us to show him
12  the ebidt figures, that is the earnings before income
13  depreciation tax figures, and that he would review those
14  figures and then submit an offer.

15      Q.   When you met with him, had you already spoken
16  with the president or Mr. Fukuda?  I'm sorry, about
17  Exhibit 48, about this offer.

18      A.   No, I met with him prior to the time that this
19  offer came in, but needless to say, I did tell
20  Mr. Fukuda and get the approval of the president with
21  regard to the idea of meeting with him.

22      Q.   So did this offer come in after you gave him
23  the tax figures that he wanted; is that right?

24      A.   Yes, I believe so.

25      Q.   Was there any follow up from Sports Shinko

Colliers after this came in, after this offer Exhibit 48 came in?

  A.  I don't really recall, however, I believe that I did in every instance what I was instructed to do by the president. If he said to reject the offer, I rejected it. If he said to just leave it hanging there, I would just leave it hanging there. I did whatever the president instructed me to do. However, I have no specific recollection as to what was done subsequently in this case.

  Q.  So you don't recall asking Mr. Allred or asking Colliers to follow up with Mr. Allred about whether they would assume the management contract for any of these properties, Sports Shinko Pukulani, Sports Shinko Kauai, or Sports Shinko Mililani?

  A.  I do not. However, from Sports Shinko's standpoint, our opinion was that Mr. Allred was a professional developer and that we thought he would take a pretty severe stance and that it was almost a guarantee that he would end up lowering that offered figure of $11 million. So we didn't view this as a particularly great offer.

  Q.  For any of these discussions or communications with these potential buyers, did you talk to Mr. Nishida or Mr. Tomita about the nature of your discussions with

1  any of these potential buyers?
2      A.   Not at all.
3      Q.   You mentioned before that the listing and the
4  marketing efforts from Colliers were supposed to be
5  confidential; is that right?
6      A.   Yes.
7      Q.   Was it confidential even from Mr. Nishida or
8  anybody at RMS?
9      A.   No, they were aware that the properties were to
10 be sold because we needed to get materials from them.
11     Q.   So they provided due diligence documents
12 regarding the properties; is that right?
13     A.   Yes.
14     Q.   Did the president or Mr. Fukuda ever discuss
15 with you how important it was that a buyer assume the
16 RMS management agreements?
17     A.   No.
18     Q.   Did anybody else at Sports Shinko, and I mean
19 other than the president or Mr. Fukuda, talk to you
20 about that, the importance of the assumptions of the
21 management agreements?
22     A.   No.
23     Q.   Did Mr. Nishida or Mr. Tomita ever discuss that
24 same topic with you at all?
25          MR. KOMEIJI:  Clarification, the topic being?

***ATTORNEY-CLIENT PRIVILEGE***                296

```
 1                    C E R T I F I C A T E

 2   STATE OF HAWAII                )

 3   CITY AND COUNTY OF HONOLULU    )

 4           I, BARBARA ACOBA, Certified Shorthand

 5   Reporter and Notary Public, State of Hawaii, do

 6   hereby certify:

 7           That on Thursday, April 21, 2005, at

 8   9:00 a.m., appeared before me SATOSHI KINOSHITA, the

 9   witness whose deposition is contained herein; that

10   prior to being examined he was by me duly sworn;

11           That the deposition was taken down by me

12   in machine shorthand and was thereafter reduced to

13   typewriting under my supervision; that the foregoing

14   represents, to the best of my ability, a true and

15   correct transcript of the proceedings had in the

16   foregoing matter.

17           I further certify that I am not an attorney

18   for any of the parties hereto, nor in any way concerned

19   with the cause.

20           Dated this 30th day of April, 2005,

21   in Honolulu, Hawaii.

22

23                     BARBARA ACOBA, CSR NO. 412

24                     Notary Public, State of Hawaii

25                     My Commission Exp: 10-22-2008
```

RALPH ROSENBERG COURT REPORTERS
Honolulu, Hawaii  (808) 524-2090