# PURCHASE AND SALE AGREEMENT

**THIS PURCHASE AND SALE AGREEMENT** ("Agreement") is made as of this 15ᵗʰ day of January, 2002 ("Agreement Date"), by and between SPORTS SHINKO (WAIKIKI) CORPORATION, a Hawaii corporation, SPORTS SHINKO (MILILANI) CO., LTD., a Hawaii corporation, SPORTS SHINKO (KAUAI) CO., LTD., a Hawaii corporation, on its behalf and as the successor in interest to Sports Shinko (Kauai) Development Co., Ltd., SPORTS SHINKO (PUKALANI) CO., LTD., a Hawaii corporation, PUKALANI STP CO., LTD., a Hawaii corporation, SPORTS SHINKO (HAWAII) CO., LTD., a Hawaii corporation, SURE TRANSPORTATION, INC., a Hawaii corporation (hereinafter collectively referred to as "Seller" or individually as a "Seller"), and KG HOLDINGS, LLC, a Hawaii limited liability company, and its nominees ("Buyer").

In consideration of the mutual covenants and conditions set forth below, and other good and valuable consideration, the receipt and adequacy of which are hereby acknowledged, the parties agree as follows:

1.    <u>Sale of the Property</u>.

1.1    <u>Property to be Sold</u>. Seller agrees to sell, and Buyer agrees to purchase, on the terms and conditions set forth in this Agreement, all of Seller's right, title and interest in and to the following described property (collectively, the "Property"), free and clear of liens and encumbrances other than the Permitted Encumbrances (as defined hereinbelow), and excluding any property described in Section 1.2 hereinbelow:

(a)    **Real Property**.

(i)    All of Seller's right, title, and interest in, to and under that certain lease dated September 22, 1966 ("QK Hotel Lease"), by and between Seller and Bishop Trust Company, Limited, Trustee under the Will and of the Estate of Emanuel S. Cunha, Deceased ("Ground Lessor"), more particularly described in <u>Exhibit A-1</u> attached hereto and made a part of this Agreement demising, among other things, the real property situate at Kekio, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, upon which Seller operates the hotel commonly known as the Queen Kapiolani Hotel, and all improvements located thereon, together with all easements and rights appurtenant to such land described therein ("QK Hotel").

(ii)    All of Seller's right, title, and interest in, to and under that certain lease dated October 20, 1986 ("OR Hotel Lease"), by and between Seller and Pacific Holiday, Inc. ("OR Lessor"), more particularly described in <u>Exhibit A-2</u> attached hereto and made a part of this Agreement demising, among other things, the real property situate at Kekio, Waikiki, Honolulu, City and County of Honolulu, State of Hawaii, upon which Seller operates the hotel commonly known as the Ocean Resort Hotel, and all improvements located thereon, together with all easements and rights appurtenant to such land described therein ("OR Hotel").

**232 0003**



(iii) Approximately 296.758 acres of land located in Poipu, Island and County of Kauai, State of Hawaii, commonly known as the Kiahuna Golf Club ("Kiahuna Golf Club"), designated as Tax Map Key Nos. (4) 2-8-014-007, (4) 2-8-014-008, (4) 2-8-014-028, (4) 2-8-014-03 1, (4) 2-8-014-032, (4) 2-8-014-033, (4) 2-8-014-034, (4) 2-8-014-035, (4) 2-8-014-036, (4) 2-8-015-077, and more particularly described in Exhibit A-3 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein, together with Seller's interest as lessee under that certain Lease of Easement dated April 17, 1991, by Grove Farm Company, Incorporated, and Sports Shinko (Kauai) Co., Ltd., a short form of which is dated April 17, 1991, by Grove Farm Company, Incorporated, and Sports Shinko (Kauai) Co., Ltd., filed as Land Court Document No. 1817514 ("Kiahuna Easement Lease"). (The area demised by the Kiahuna Easement Lease is hereinafter referred to as the "Kiahuna Easement Area.")

(iv) Approximately 172.099 acres of land located in Mililani, City and County of Honolulu, State of Hawaii, including the property commonly known as the Mililani Golf Club ("Mililani Golf Club"), designated as Tax Map Key Nos. (1) 9-5-001-035 and (1) 9-5-001-076 and more particularly described in Exhibit A-4 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein; and

(v) Approximately 195.208 acres of land located in Makaehu, Kohoilo, Aapueo-Nui, District of Kula, Island and County of Maui, State of Hawaii, including the property commonly known as the Pukalani Country Club ("Pukalani Country Club"), designated as Tax Map Key Nos. (2) 2-3-8-5, (2) 2-3-9-4, (2) 2-3-8-36, (2) 2-3-9-39, (2) 2-3-9-40, (2) 2-3-47-126, (2) 2-3-48-125, (2) 2-3-49-88, (2) 2-3-55-68, (2) 2-3-55-69, (2) 2-3-56-95, (2) 2-3-56-96, (2) 2-3-56-97, (2) 2-3-56-98, (2) 2-3-57-121, (2) 2-3-57-124, (2) 2-3-57-138, (2) 2-3-61-114, and more particularly described in Exhibit A-5 attached to and made a part of this Agreement, including all improvements located thereon, together with all easements and rights appurtenant to such land described therein.

The foregoing real property is hereinafter referred to as the "Real Property." The QK Hotel and the OR Hotel are sometimes referred to herein as the "Hotels." The Kiahuna Golf Club, Mililani Golf Club and the Pukalani Country Club are sometimes hereinafter collectively referred to as the "Golf Courses." The QK Hotel Lease and the OR Hotel Lease are sometimes collectively referred to as the "Ground Leases."

(b)    **Personal Property**. All tangible personal property located on the Real Property used in connection with the ownership, operation or maintenance of the Hotels, Golf Courses and Real Property, including, but not limited to, any and all furniture, fixtures, computers and software programs, equipment, vehicles, inventory, supplies, machinery and those certain items of tangible personal property identified in Exhibit B attached hereto and made a part of this Agreement, subject, however, to normal depletion and/or wear and tear as shall occur in the normal course of business ("Personal Property").

**232 0004**

(c)    **Permits**.    All transferable permits, licenses, approvals, authorizations, declarations and applications granted or issued by any governmental agency to Seller and used in connection with Seller's ownership or occupancy of the Real Property or Seller's operation of the Hotels or Golf Courses or development of the Real Property (the "Permits").

(d)    **Agreements, Reports and Plans**.  All transferable agreements, development agreements, management agreements, trademarks, trade names, logos, reports, environmental and archeological surveys, studies and reports, plans, architectural, soils and engineering plans, specifications, schematics, surveys, title reports, appraisals, development studies, maps, bonds, deposits, fees, studies, notices and other materials prepared, given, filed or used or to be used in connection with the Property, the Hotels or the Golf Courses (collectively, the "Agreements, Reports and Plans"), and all assignable contracts, if any, entered into by Seller relating to, directly or indirectly, the Property which are approved by Buyer during the due diligence period (the "Assumed Contracts").

(e)    **Tradenames**.  The following tradenames and logos used by Seller in connection with the ownership or operation of the Hotels:  Ocean Resort Hotel and Queen Kapiolani Hotel ('Tradenames").

(f)    **STP**.  All of the outstanding stock or assets of Pukalani STP Co., Ltd., a Hawaii corporation.  For purposes of this Agreement, the term "Real Property" shall include the real property owned by Pukalani STP Co., Ltd., including all of the real property described in Exhibit A-6 attached hereto.

(g)    **Experience Rating**.   Seller's experience ratings for Hawaii unemployment insurance purposes.

(h)    **Books and Records**.  All books and records relating to the ownership, operation, use and maintenance of the Real Property, Hotels and Golf Courses; provided, however, that after Closing, Seller shall be provided with reasonable access to, and shall be permitted to make copies of, such books and records, as may be required by Seller for taxation, audit, financial reporting, litigation or other reasonable business purposes.

(i)    **Reservations, Accounts, Intangible Property**.   All reservations, guest deposits, guest lists, customer lists, security deposits, prepaid rent, credits, refunds, accounts receivable, telephone numbers, fax numbers, internet domain names, and other intangible property used or relating to the ownership, operation, maintenance and use of the Real Property, the Hotels or the Golf Courses.

(j)    **Tenant Leases**.  All of Seller's interest as lessor under all tenant leases, licenses and other occupancy or use agreements for space in or on the Real Property or any portion thereof.

(k)    **Security Deposits**.  All security deposits under all tenant leases, licenses and other occupancy or use agreements described in subparagraph 1.1(j).

**232  0005**

(l)    **Warranties**. All warranties and guarantees running in favor of Seller, to the extent they relate to the Property, which are in effect on the Closing Date and which are assignable in accordance with their terms.

(m)    **Sure Transportation**. All of the stock or assets of Sure Transportation, Inc.

(n)    **Equipment Leases**. All equipment leases which are approved by Buyer and assignable to Buyer ("Equipment Leases").

1.2.    **Excluded Items**. Notwithstanding anything contained in Section 1.1 hereinabove, Buyer understands and agrees that the following are excluded from the Property to be sold, assigned, transferred and conveyed to Buyer hereunder:

(a)    **Insurance Policies**. All policies of insurance under which Seller is a named or an additional named insured. Buyer shall be responsible for obtaining its own insurance as of the Closing (as defined in Section 6.3 hereinbelow) and for the period thereafter.

(b)    **Utility Service in Seller's Name**. All utility services (such as telephone services) provided to Seller in Seller's name. Seller will arrange for the discontinuance, effective as of the Closing Date (as defined in Section 6.3 hereinbelow), of all such utility services, and Buyer shall be responsible for its own utility services thereafter. Any deposits for utilities made by Seller shall be the property of Seller, and Buyer shall be responsible for any required replacements thereof. Seller shall assign all rights to the telephone numbers, fax numbers and internet domain names used in connection with the operation of the Hotels and Golf Courses.

(c)    **Certain Permits, Agreements, Reports and Plans, Equipment Leases**. Any Permits, Agreements, Reports, Plans or Equipment Leases that cannot be assigned to Buyer by law or the terms of thereof.

(d)    **Third Party Property**. Any property owned by any tenant, concessionaire, licensee or other occupant (other than Seller) of the Real Property, or by any person other than Seller.

(e)    **Intercompany Receivables or Agreements**. Any receivables or indebtedness owed to Seller by any affiliate of Seller, and any agreements among Seller or between Seller and any affiliate of Seller (other than the Ocean Resort Club and Royal Green Club agreements, which shall be assigned to, and assumed by Buyer's nominees taking title to the Hotels and Golf Courses).

(f)    **Bank Accounts and Cash on Hand**. All bank accounts and cash on hand of Seller, other than the house bank and petty cash, subject to any applicable proration provisions herein.

**232 0006**

(g)    **Pre-Closing Accounts Receivable**.  All pre-closing accounts receivable which relate to services rendered or accommodations provided prior to Closing.

(h)    **Miscellaneous**. That certain property identified in <u>Exhibit C</u> attached hereto and made a part of this Agreement.

1.3    **Permitted Encumbrances**.  The Property shall be conveyed subject to the following (collectively, "Permitted Encumbrances"):

(a)    All matters disclosed by the Buyer's Title Policy (as defined in Section 6.2) and approved by Buyer; provided, however, that Seller shall not be obligated hereunder to cure any title matter or remove any encumbrance on title disclosed in any title report or title policy prior to Closing, other than (i) that certain mortgage and related financing statements in favor of The Fuji Bank, Ltd. with respect to the OR Hotel and (ii) that certain Second Mortgage in favor of Stacey J. Wong, as Trustee of the Eric A. Knudsen Trust et al. with respect to the Kiahuna Golf Club, and that Buyer's remedy in event that Buyer does not approve of any such matter or encumbrance shall be to terminate this Agreement; and

(b)    Any other matter agreed to in writing by Buyer prior to the Closing.

1.4    **No Assumption of Liabilities**.  Except as expressly provided herein, Buyer shall not assume any obligations or liabilities of Seller relating to the Property other than the Assumed Contracts, the Ground Leases and the Equipment Leases.  Buyer shall not assume any claims, obligations or liabilities under the Assumed Contracts, Ground Leases or Equipment Leases which accrued prior to the Closing Date. For example, Buyer shall not be liable for any rents which accrued under the Ground Leases prior to Closing. Seller shall indemnify, defend and hold harmless Buyer from any claims, liabilities or obligations of Seller which are not expressly assumed by Buyer or which accrued prior to the Closing Date.

2.    **Purchase Price; Deposit**.

2.1    **Total Purchase Price**.  The total purchase price to be paid by Buyer to Seller for the Property is the sum of TWENTY-TWO MILLION UNITED STATES DOLLARS (U.S.$22,000,000.00) ("Purchase Price").

2.2    **Payment of Purchase Price**. The Purchase Price for the Property shall be payable as follows:

(a)    Buyer shall pay the Initial Deposit as set forth in Section 2.3 hereinbelow.

(b)    At the Closing, Buyer shall execute and deliver to Title Guaranty Escrow Services, Inc., 235 Queen Street, Honolulu, Hawaii 96813, Attention: Barbara Paulo ("Escrow Agent"), promissory notes payable to each Seller (the amounts thereof to be allocated by mutual agreement of Buyer and Seller) in the aggregate principal

**232 0007**

amount of Nine Million Dollars ($9,000,000.00), in substantially the form attached hereto as Exhibit D (the "Notes"). The Notes shall be unsecured and shall provide for quarterly interest only payments, with the first payment due ninety (90) days after the Closing Date and each payment due on the same day of the first month of each quarter thereafter. Interest shall accrue on the Notes at the rate of six percent (6%) per annum, non-compounded. The maturity date of the Notes shall be ten (10) years after the Closing Date.

        (c)     At the Closing, Buyer shall deposit with the Escrow Agent the remainder of the Purchase Price in cash, subject to adjustment in accordance with Section 6.7 below, and/or by way of assumption of the Bank of Hawaii loan secured by certain mortgages on a portion of the Real Property (the "Mortgage Loan"), together with Buyer's portion of the closing costs as provided in Section 6.6 hereinbelow. On the Closing Date, Escrow Agent shall apply the Initial Deposit and interest thereon towards payment of the Purchase Price.

      2.3    **Deposit**.

        (a)     At the time that escrow is opened pursuant to Section 6.1 hereinbelow, Buyer shall deposit with Escrow Agent the sum of ONE HUNDRED THOUSAND UNITED STATES DOLLARS (U.S. $100,000.00) ("Initial Deposit").

        (b)     If Buyer shall not have given Seller notice of its intention to proceed with the acquisition of the Property ("Notice to Proceed") prior to the expiration of the Due Diligence Period described in Section 3.1 hereinbelow, the Initial Deposit shall be returned to Buyer and the parties shall have no further obligations to each other relating to the Property or this Agreement, except for the obligations under Section 17.11 hereinbelow, and such covenants and indemnities which expressly survive the purchase of the Property by Buyer.

        (c)     If Seller has timely received the Notice to Proceed from Buyer, then the Initial Deposit shall become nonrefundable and shall be applied against the Purchase Price of the Property upon Closing (as defined in Section 6.3 below); provided, however, that if Closing does not occur because of a default by Buyer under this Agreement, then Seller shall be entitled to retain the Initial Deposit as damages for Buyer's default, pursuant to the provisions of Section 14 below.

        (d)     If Buyer shall fail to timely deposit the Initial Deposit with the Escrow Agent, Seller shall have the option to terminate this Agreement upon written notice to the Escrow Agent and the parties hereto shall be released from all further obligations and liabilities under this Agreement, except for the obligations under Section 17.11 hereinbelow.

      2.4    **Interest on Deposit**. The Initial Deposit shall be held by the Escrow Agent in an interest-bearing account as directed by Buyer. All interest on the Initial Deposit shall accrue and be paid to the party entitled to the benefit of the Initial Deposit under this Agreement.

**232 0008**

3.    **Due Diligence Review**.

    3.1    **Due Diligence Period**.

        (a)    The "Due Diligence Period" shall commence on the Agreement Date and shall terminate on the Closing Date ("Due Diligence Period").

        (b)    If Buyer shall not have given Seller the Notice to Proceed prior to the expiration of the Due Diligence Period, then: (i) Seller and Buyer shall promptly execute any cancellation documents requested by Escrow Agent, (ii) Escrow Agent shall refund the Initial Deposit to Buyer (less any escrow fees), together with any and all interest accrued thereon, and (iii) the parties shall have no further obligations to each other under this Agreement, except for the obligations under Section 17.11 hereinbelow or otherwise specifically provided herein.

    3.2    **Inspection of Property**.

        (a)    During the Due Diligence Period, Buyer shall have the right to inspect the Property and review those matters concerning the Property which are reasonably necessary in connection with its purchase of the Property. Seller shall use commercially reasonable efforts to provide access to Buyer and its representatives at all reasonable times between the date of this Agreement and the Closing Date to Seller's representatives, personnel and assets and to all existing books, records, tax returns, work papers, financial reports, maps, leases and other documents and information relating to the Property and the operation and maintenance of the Hotels and the Golf Courses. Seller shall cooperate with and assist Buyer in Buyer's review of such information and use its best efforts to provide and compile such information as Buyer may reasonably request as quickly as reasonably practicable. All review and investigation by Buyer pursuant to this Section 3.2 shall comply with the confidentiality requirements of Section 17.11 hereinbelow.

        (b)    From and after the Agreement Date, Buyer and its consultants, employees, contractors and agents (collectively, "Buyer's agents") may enter the Property during regular business hours for the purpose of conducting such investigations, inspections and tests of the Property which may be reasonably necessary for Buyer's review and investigation of the Property; provided that such access and work shall not unreasonably interfere with the operation of Seller's business on the Real Property.

        (c)    Buyer shall not conduct any drilling, boring or other intrusion tests without Seller's written consent which may be withheld at Seller's sole discretion. Buyer shall give Seller at least twenty-four (24) hours' notice (business day) in advance of any intended inspection or entry. Buyer shall comply with all laws and regulations in connection with its entry or acts upon the Property.

        (d)    In the event that Buyer does not purchase the Property, any damage to the Property caused or made by Buyer or Buyer's agents shall be promptly repaired by Buyer and Buyer shall put the Property back in the same condition as before the inspection or entry.

232 0009

(e)     Buyer hereby agrees to indemnify, defend and hold Seller harmless from and against any and all loss, expense, claims, damage, injury or liability arising out of such inspection, the entry and/or acts upon the Property by Buyer or Buyer's agents. This indemnity provision shall survive the purchase of the Property by Buyer or the termination of this Agreement.

3.3     **No Extension of Due Diligence Period**. No extension of the Due Diligence Period shall be granted except upon Seller's written consent, which may be withheld at Seller's sole discretion.

3.4     **Delivery of Documents**.

(a)     Within five (5) business days after execution of this Agreement by Buyer and Seller, or Seller's receipt of Buyer's request, whichever is later, Seller shall deliver to Buyer such documents and records in Seller's possession relating to the Property as Buyer may reasonably request (collectively, the "Due Diligence Materials"); provided, however, that Seller shall not be required to create or cause the re-creation of documents which are not currently in existence or in Seller's possession, and Seller expressly shall not be responsible for any costs and expenses associated with such documents and reports that Buyer has performed or prepared, including, without limitation, any ALTA survey, Phase I environmental assessment, or ADA surveys obtained by Buyer. Other than those documents or reports which Seller has expressly agreed to provide herein at Seller's expense, all of such documents and records shall be obtained by Buyer at Buyer's sole expense.

(b)     Within three (3) business days after the execution of this Agreement by Buyer and Seller, Seller shall request Title Guaranty of Hawaii, Incorporated, 235 Queen Street, Honolulu, Hawaii 96813 ("Title Company"), to furnish to Buyer, at Buyer's expense, a status title report covering the Real Property ("Title Report") and a financing statement report listing all of the financing statements filed with respect to the Property.

(c)     Notwithstanding anything stated to the contrary herein, Seller shall not be required to disclose to Buyer (i) any document or information regarding any other negotiations or transactions which relate to the sale of the Property to any other purchaser; (ii) any document or information which Seller is contractually or legally prohibited from disclosing; or (iii) any attorney-client communications between Seller and its legal counsel.

4.     **Seller's Representations**.

4.1     **Representations**. Seller, by Seller's execution of this Agreement, makes the following limited covenants, representations and warranties to Buyer, which covenants, representations and warranties are true and correct as of the date hereof (subject to completion of the schedules to be attached prior to the Closing) will be true and correct as of the Closing Date, and except for subsections (a) and (b), the following covenants, representations and warranties are made to the best of Seller's knowledge with no

**232 0010**

duty to investigate and such actual knowledge shall be limited to the actual knowledge of Seller's executive vice president, Satoshi Kinoshita. Each Seller's representations herein are made only with respect to such Seller and such Seller's respective property.

        (a)    **Organization**. Seller (and each of them) is a corporation duly organized, validly existing and in good standing under the laws of the State of Hawaii, and is authorized to do business in the State of Hawaii. Seller has all requisite corporate power and authority to enter into this Agreement.

        (b)    **Due Authorization**. This Agreement and all the documents executed by Seller pursuant to this Agreement, including, without limitation, those documents which are to be delivered to Buyer at Closing (the "Related Documents"), are, and at Closing, will be, duly authorized, executed, and delivered by Seller and constitute the legal, valid, and binding obligations of Seller, enforceable against Seller in accordance with their terms. The execution, delivery and performance of this Agreement and the Related Documents do not and, to Seller's actual knowledge, will not violate any provisions of any mortgage, agreement or undertaking to which Seller is a party or by which the Property may be bound or affected, except (i) to the extent that the consent of third parties to the transfer of certain Property may be required; and (ii) as provided in Section 1.2(c) hereinabove.

        (c)    **No Litigation**. There are no lawsuits or legal proceedings pending and no investigation or other proceeding whatsoever threatened to liquidate or dissolve Seller, or to declare any of its rights, powers or privileges to be null or void or otherwise than in full force and effect, or to obtain any decree, order, judgment or other judicial determination or administrative or other ruling which will or may impede or detract from any of the rights, powers or privileges vested in or claimed by Seller. Seller has not received any written notice of any outstanding legal actions, suits, or other legal or administrative proceedings, including condemnation proceedings, pending or threatened against the Property or Seller, other than proceedings which will not have any material adverse effect on Seller's ability to perform its obligations hereunder. Seller has no actual knowledge of any outstanding judgments against Seller or the Property or of any special assessment affecting the Real Property.

        (d)    **No Obligations Prior to Closing**. From the Agreement Date until the Closing Date, Seller will not enter into any leases or rentals of all or any part of the Property, or any other contracts or obligations relating to the Property which will not terminate on or prior to the Closing Date. From the Agreement Date until the Closing Date, Seller will not market the Property, offer the Property for sale or other disposition, or negotiate with any other party for the sale of the Property. At Closing, there will be no outstanding contracts made by Seller for any improvements to the Real Property which have not been fully paid for and Seller shall have discharged all mechanic's or materialmen's liens arising from any labor or materials furnished to the Real Property prior to Closing. Seller agrees to indemnify and hold harmless Buyer from any liability arising from the non-payment for such improvements made prior to Closing.

**232 0011**

(e)    **No Defaults**. Seller has not received notice from the lessors under the Ground Leases (the "Ground Lessors") of any defaults under the Ground Leases except as described in Exhibit E. Except as set forth in Schedule 4.1(e), there are no material defaults on the part of Seller under the Ground Leases, Equipment Leases, Assumed Contracts, Tenant Leases, Permits or Licenses or any condition that with the passage of time and/or the giving of notice may constitute a material default thereunder.

(f)    **No Required Consents**. Except as set forth in Schedule 4.1(f), there are no parties whose consent or approval is necessary in order for Seller to be bound by this Agreement or perform its obligations hereunder.

(g)    **Conformance with Law**. Except as set forth in Schedule 4.1(g), there are no uncured violations of any federal, state or local laws and regulations relating to land use, zoning, building, fire, environmental, hazardous materials, health and safety requirements, and accessibility requirements for disabled persons affecting the Property. Seller has not received any notice from any governmental agency of any actual or alleged violations of any such laws, other than notice of violations which are not material in scope or which have been or will be cured prior to Closing.

(h)    **Title At Closing**. Seller will have good and valid title to the Property, except for any Permitted Encumbrances, and none of the Property will be subject to any lien or encumbrance except Permitted Encumbrances.

(i)    **Employee Relations**. Seller is in substantial compliance with all federal, state or other applicable laws, domestic or foreign, respecting employment and employment practices, terms and conditions of employment and wages and hours, and has not and is not engaged in any unfair labor practice. No unfair labor practice complaint against Seller is pending before the National Labor Relations Board or any Hawaii governmental agency, authority, board or commission with respect to labor or employment matters. There is no labor strike, dispute, slowdown or stoppage actually pending or threatened against or involving Seller. No grievance which might have a material adverse effect upon Seller or the conduct of Seller's business exists, no arbitration proceeding arising out of or under any collective bargaining agreement is pending and no claim therefor has been asserted. Except as set forth in Schedule 4.1(i), Seller's employees are not represented by any union and there are no collective bargaining agreements in effect; and Seller has not experienced any material labor difficulty during the last two (2) years.

(j)    **Employee Benefit Plans**.

(i)    Schedule 4.1(j) lists all plans, programs, commitments or arrangements maintained by or on behalf of Seller or any other party that provides benefits or compensation to, or for the benefit of, any current or former employee of Seller ("Plans"). Only current and former employees of Seller participate in the Plans. Copies of all Plans and, to the extent applicable, all related trust agreements, Summary Plan Descriptions, Annual Report Form 5500's and Internal Revenue Service determination letters and any related Plan documents have been or will be delivered to Buyer as quickly as possible and not less than 10 days prior to the Closing Date.

**232 0012**

(ii)     With respect to each Plan, except as set forth on Schedule 4.1(j): (i) no litigation or administrative or other proceeding is pending or threatened involving such Plan, (ii) such Plan has been administered and operated in compliance with, and has been amended to comply with all applicable requirements of law, including but not limited to, the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), and the Internal Revenue Code of 1986, as amended (the "Code"), and the regulations issued under ERISA and the Code; and (iii) such Plan has been administered and operated only in the ordinary and usual course and in accordance with its terms. Seller has made all payments or contributions required to be made under the provisions of the Plans subject to ERISA or by law with respect to any period prior to the Closing Date.

(iii)     Neither Seller nor any of the Plans has any obligation to provide, or liability for, health care, life insurance or other benefits after termination of employment, except for retirement benefits under the 401k plan or except as required by ERISA Section 601 (and Section 4980B of the Code).

(iv)     Prior to termination of their employment by Seller, notice of availability of continuation coverage (as defined in Section 602 of ERISA and Section 4980B of the Code) will have been provided to all persons entitled thereto and all persons electing such coverage will be (or have been, if applicable) provided such coverage.

(v)     Seller has not taken and does not intend to take any action and no event has occurred, which has resulted or could reasonably result in withdrawal liability under Title IV of ERISA with respect to any multi-employer pension plan as defined in Section 3(37) of ERISA.

(vi)     Buyer shall not, by reason of the purchase executed through this Agreement, be required to contribute to or incur any liability with respect to: (A) any employee pension plan within the meaning of Section 3(2) of ERISA, including, without limitation, a multi-employer pension plan as defined in Section 400 1(a)(3) of ERISA; or (B) any other plan, contract, arrangement providing for bonuses, deferred compensation, excess benefits, special retirement benefits, profit sharing, incentive pay, severance pay, hospitalization expense or medical expense, insurance or vacation plans, supplemental unemployment benefit plans or other employee benefit plans, policies, agreements, arrangements or understandings, including, without limitation, any employee benefit plans described in Section 3(3) of ERISA.

(k)     **Disclosure of Material Adverse Facts.** Seller has no actual knowledge of any adverse fact or condition relating to the Property that Seller, in good faith, believes to be material, which has not been specifically disclosed in writing or in due diligence materials provided by Seller to Buyer or of any fact or condition of any kind or character which has not been so disclosed and which Seller, in good faith, believes to materially and adversely affect the Property.

(l)     **Accurate Information.** Seller has no actual knowledge that any statement made herein is not true and correct or that the information provided and to be provided by Seller to Buyer relating to this Agreement contains and will contain any

**232 0013**

statement which, at the time and in the light of the circumstances under which it is made, Seller, in good faith, believes to be false or misleading with respect to any material fact.

    4.2   **Limitations**.

       (a)   Except as expressly set forth in this Agreement, Seller makes no other warranties or representations whatsoever, and none shall be implied, with respect to the Property.

       (b)   The representations and warranties contained in this Section 4 shall survive only for a period of one (1) year after the Closing Date and shall then become null and void and no claim thereon shall be brought by Buyer thereafter.

       (c)   In the event that Buyer alleges any type of breach of any representation or warranty during such one-year period which may result in a claim, Buyer shall provide Seller with written notice expressly describing the nature of such breach and shall allow Seller the opportunity to cure the breach complained of, if the same is curable.

       (d)   If Seller does not commence a reasonable cure within thirty (30) days after such written notice is given to Seller, Buyer may proceed to cure the breach and proceed with its claim.

    5.   **Buyer's Representations**. Buyer represents and warrants to Seller that:

    5.1   **Organization**. Buyer is a limited liability company duly organized, validly existing and in good standing in the State of Hawaii and has the capacity and full power and authority to enter into and carry out Buyer's agreements contained in, and the transactions contemplated by, this Agreement, and that this Agreement has been duly authorized and executed by Buyer, and upon delivery to and acceptance by Seller, shall be a valid and binding agreement of Buyer.

    5.2   **No Litigation**. There are no lawsuits or legal proceedings pending and no investigation or other proceeding whatsoever threatened to liquidate or dissolve Buyer, or to declare any of its rights, powers or privileges to be null or void or otherwise than in full force and effect, or to obtain any decree, order, judgment or other judicial determination or administrative or other ruling which will or may impede or detract from any of the rights, powers or privileges vested in or claimed by Buyer.

    5.3   **No Required Consents**. There are no persons whose consent or approval is necessary in order for Buyer to be bound by this Agreement.

    5.4   **Buyer's Acknowledgment**. Buyer acknowledges, accepts and agrees to each of the following:

       (a)   **Asbestos and Lead Paint and Other Hazardous Materials**. Buyer acknowledges that asbestos or lead based paint or other hazardous materials may exist in the improvements on the Real Property.

**232 0014**

(b)    **Use Permits and Other Approvals**. Neither Seller, nor Seller's agents or attorneys, makes any representations or warranties about use permits or other approvals.

(c)    **Condition of Property**.  Except for structural problems of which Seller has actual knowledge, and believes, in good faith, to be material, and which are described in Schedule 5.4(c) or in any due diligence materials provided by Seller to Buyer, Seller makes no representation regarding the physical or mechanical condition of any portion of the Property, including, but not limited to the roofs, exterior walls, or structural components of the Property and the heating, air conditioning, plumbing, ventilation, elevator, utility, sprinkler and other mechanical and electrical systems, apparatus and appliances located on or about the Real Property.

(d)    **Leasehold Real Property**. The Kiahuna Easement Area and Real Property on which the QK Hotel and OR Hotel are located are leasehold real property. Buyer has reviewed and understands all of the terms of the Kiahuna Easement Lease and Ground Leases and agrees that, after Closing, Buyer shall perform all obligations under the Kiahuna Easement Lease and Ground Leases required to be performed by the lessee thereunder accruing after the Closing, and shall defend, indemnify and hold Seller harmless from and against any claims, damages, losses or liability arising from Buyer's failure to do so after Closing. Buyer acknowledges that Seller has made no representations whatsoever about the availability of the leased fee interest for purchase.

6.    **Escrow and Closing**.

6.1    **Opening of Escrow**. Not later than three (3) business days after the execution by Buyer and Seller of this Agreement, the parties shall open an escrow with Escrow Agent by depositing with Escrow Agent a fully executed copy of this Agreement. Escrow Agent shall prepare and submit to Seller and Buyer for approval escrow instructions, incorporating this Agreement as a part thereof, and containing such other standard and usual provisions as may be requested by Escrow Agent and approved by Seller and Buyer in writing; provided, however, that no escrow instruction shall modify or amend any provision of this Agreement. If there is a conflict between any such escrow instructions and the provisions of this Agreement, the provisions of this Agreement shall control.

6.2    **Title Policy**. Buyer's obligations hereunder shall be conditioned upon Buyer having obtained, at Buyer's sole expense, on or before the Closing Date a binding commitment for title insurance to be issued at Closing by the Title Company (defined below), which commitment shall be for a policy on American Land Title Association Owner's Policy, or the equivalent, with extended coverage containing such endorsements as reasonably required by Buyer, in the amount of the Purchase Price, against loss or damage by reason of defects in Seller's title as of the Closing Date and containing no exceptions other than the Permitted Exceptions ("Buyer's Title Policy").

6.3    **Closing**. Closing of the purchase of the Property ("Closing") shall occur on January 25, 2002 ("Closing Date"), subject to the satisfaction of the conditions

**232 0015**

contained herein. The execution and delivery of the Transfer Documents (as defined below) shall take place at 10:00 a.m. Hawaii Standard Time on January 24, 2002 at the offices of the Escrow Agent in Honolulu, Hawaii (the "Pre-Closing"), or at such other time or place as the parties may mutually stipulate. Recordation of the applicable Transfer Documents shall occur on the Closing Date. This is a firm closing date and time is of the essence. No extensions shall be permitted except by written agreement of Seller and Buyer or except as required to obtain any necessary consents. Escrow Agent shall close escrow when (a) the Title Company is prepared to issue Buyer's Title Policy, (b) Escrow Agent has received all necessary documents and funds as set forth in this Agreement, and (c) all other conditions to Closing set forth herein have been satisfied or have been waived by the party intended to be benefited thereby.

6.4    **Closing Deliveries**.

(a)    At the Closing, Seller shall deliver to Buyer the following (collectively, "Transfer Documents"):

(i)    Warranty deeds, in form and substance acceptable to both parties, executed by Seller in recordable form and conveying to Buyer's nominees all of Seller's right, title and interest in and to the Real Property (other than the Ground Leases) subject only to the Permitted Encumbrances (the "Deeds");

(ii)    Assignments of lease, in form and substance acceptable to both parties, executed by Seller in recordable form and conveying to Buyer's nominees all of Seller's right, title and interest in and to the Kiahuna Easement Area, the Ground Leases, subject only to the Permitted Encumbrances, together with the consent of the lessor under the Kiahuna Easement Lease and each of the Ground Leases, as provided in Section 7.3 hereinbelow (the "Assignment of Lease");

(iii)    Bills of sale, in form and substance acceptable to both parties, executed by Seller and conveying to Buyer's nominees good and marketable title to the Personal Property;

(iv)    Subject to Section 1.2(c) hereinabove, assignments of permits and agreements, in form and substance acceptable to both parties, executed by Seller and assigning to Buyer's nominees all of Seller's right, title and interest in, to and under the Permits, Agreements, Reports and Plans, Assumed Contracts, and Equipment Leases;

(v)    Assignments of tradenames, in form and substance acceptable to both parties, executed by Seller, and assigning to Buyer's nominees all of Seller's right, title and interest in, to and under the Tradenames;

(vi)    Subject to Section 1.2(c) hereinabove, all consents from third parties required for the transfer of any of the Property from Seller to Buyer's nominees, in form and substance acceptable to Buyer;

**232 0016**

(vii)    Bulk transfer report and tax clearance certificate issued by the Department of Taxation of the State of Hawaii for Seller in compliance with Hawaii law, covering the period up to the Closing Date;

(viii)    Certificates of title for any vehicles, duly endorsed to Buyer's nominees; and

(ix)    Such other and further instruments as may be required to transfer the Property to Buyer or its nominees.

(b)    At the Closing, Buyer shall deliver to the Escrow Agent the following:

(i)    The Notes duly executed by Buyer.

(ii)    In the event the remainder of the Purchase Price is paid by way of assumption of the Mortgage Loan by Buyer's nominee, a release executed by the lender releasing Seller and its affiliates from liability under the Mortgage Loan and any guaranties of such indebtedness in form and substance acceptable to Seller.

6.5    **Closing Actions**. Escrow Agent shall close escrow by:

(a)    Recording in the Bureau of Conveyances of the State of Hawaii and/or filing in the Office of the Assistant Registrar of the State of Hawaii, as the case may be, the Deeds, Assignments of Lease, and Assumption of Mortgage Loan, if applicable;

(b)    Delivering to Buyer duly executed copies of the Transfer Documents, with the Deeds, Assignments of Lease, and Assumption of Mortgage Loan, if applicable, certified by Escrow Agent as to recording and/or filing information;

(c)    Delivering to Buyer Buyer's Title Policy issued by the Title Company; and

(d)    Delivering to Seller the Purchase Price, less Seller's share of closing costs and prorations as provided in Sections 6.6 and 6.7, respectively.

6.6    **Closing Costs**. Seller and Buyer hereby agree that, unless specified elsewhere, the escrow fees and costs to close this transaction shall be prorated and paid as follows:

(a)    Seller shall pay the following: one-half (1/2) of all escrow fees; Seller's notarial fees; 100% of the cost of the Title Report; 100% of the cost to draft the Assignment of Lease and other Transfer Documents; 100% of the recording and/or filing fees for the Deeds and Assignments of Lease; all fees for any consent which Seller is obligated to obtain in order to transfer or assign the Property, and 100% of the conveyance taxes.

**232  0017**

(b)    Buyer shall pay the following: one-half (1/2) of all escrow fees; all fees for any consent which Buyer is obligated to obtain, if any; Buyer's notarial fees; 100% of the cost of Buyer's Title Policy (including the cost of any and all endorsements); and 100% of any survey or termite inspection costs. Buyer shall be responsible for paying 100% of the cost attributable to the establishment of the interest-bearing account for Buyer's deposits and any costs associated with any financing obtained by Buyer in connection with this transaction.

6.7    **Prorations, Adjustments and Closing Statement**.

(a)    **Prorations**. The following matters and items pertaining to the Property shall be apportioned between Seller and Buyer for periods or events occurring prior to 11:59 p.m. on the Closing Date ("Cutoff Time"):

(1)    **Taxes and Assessments**. All nondelinquent ad valorem taxes, special or general assessments, real property taxes, transient accommodations taxes, water and sewer fees, assessments and charges, and any municipal permit fees. If the amount of any such item is not ascertainable on the Closing Date, the credit therefor shall be based on the most recent available bill and adjusted as necessary post-closing as contemplated hereinbelow.

(2)    **Receivables**. All income and revenue from the operation of the Property (including, without limiting the generality of the foregoing, income or revenue derived from food sales, beverage sales, telephone usage, green fees, pro shop sales, coin-operated vending machines, and parking, net of all applicable collection costs, fees and charges, including attorney's fees, collection agency fees, applicable credit card commissions or other similar charges) shall be prorated as of the Cutoff Time. Buyer shall be entitled to such income and revenue from the operation of the Property after the Cutoff Time. Buyer agrees that it shall promptly remit to Seller any funds received by Buyer in payment of such accounts receivable arising prior to the Cutoff Time. With regard to any collection made from a person or entity who has accounts receivable arising both prior and subsequent to the Cutoff Time, such collection shall be applied as designated by the account debtor (and if designated as payment of an accounts receivable arising prior to the Cutoff Time, Buyer shall promptly remit such funds to Seller in accordance with the preceding sentence), but if there is no designation, then any such collection received shall be applied in chronological order starting with the oldest accounts receivable of such debtor. Seller shall be entitled to all amounts accrued to the accounts of guests occupying rooms in the Hotels, including room charges (the "Guest Ledger Receivables"), for all room nights up to but not including the room night during which the Cutoff Time occurs, and Buyer shall be entitled to all Guest Ledger Receivables for the room nights after the Cutoff Time. Seller and Buyer shall each receive a credit equal to one-half of the amount of Guest Ledger Receivables for the full room night during which the Cutoff Time occurs.

(3)    **Payables**.    Accounts payable for any ongoing obligations shall be prorated as of the Cutoff Time. Seller shall be solely responsible for the payment of accounts payable with respect to obligations accruing prior to the Closing Date.

232 0018

(4)    **Vending Machines**. Vending machine monies, if any, will be removed by Seller as of the Cutoff Time for the benefit of Seller.

(5)    **Utilities**.  Prior to the Closing Date, Seller shall notify all utility companies servicing the Hotels and Golf Courses of the anticipated change in ownership and request that all billings after the Closing Date be made to Buyer at the address specified by Buyer.  Utility meters will be read, to the extent that the utility company will do so, during the daylight hours on the Closing Date, with charges to Cutoff Time paid by Seller and charges thereafter paid by Buyer.

(5)    **Other**.  Such other items as are provided for in this Agreement or as are normally prorated in the sale of real property in Hawaii or of a hotel or golf course, except that in the case of any conflict, the terms of this Agreement shall be controlling.

(b)    **Adjustments**. The following matters and items pertaining to the Property shall be credited in total to a particular party for periods or events occurring prior to 11:59 p.m. on the Closing Date (the "Cutoff Time"):

(1)    **Contracts and Agreements**. All amounts known to be due under the Ground Leases, Equipment Leases or Assumed Contracts with reference to periods prior to the Closing Date shall be paid by Seller or credited to Buyer as a reduction of the Purchase Price. Any additional amounts not known at the Closing will be part of the post-closing adjustments contemplated hereinbelow.

(2)    **Security Deposits**. As of the Cutoff Time, Buyer shall assume all obligations and liabilities with respect to any security deposits held at Closing by Seller; provided, however, that no actual transfer of money from Seller to Buyer shall take place with respect to such deposits. Instead, Buyer shall receive a credit against the Purchase Price for the sum of such deposits held by Seller. Seller shall deliver a schedule of all such deposits to Escrow prior to Closing, and shall indemnify, defend and hold harmless Buyer from any claims or liabilities for security deposits which are not included in such list.

(3)    **Closing Costs**. Seller and Buyer shall pay such Closing costs as described in Section 6.6. Each party shall pay the costs of its respective legal, accounting and other advisors. Seller's share of Closing expenses shall be deducted from cash sums otherwise due Seller at the Closing and paid by Escrow as a credit against amounts due Seller.

(4)    **House Bank**. Seller shall receive a credit for all cash in the house bank and petty cash as of the Cutoff Time, and all such cash shall be part of the Property transferred to Buyer.

(5)    **Advance Deposits**. Buyer shall receive a credit for all advance reservation deposits for guest rooms, restaurant use, weddings, meetings and other services at the Hotels or Golf Courses ("Advance Deposits"), for all services to be performed or provided after the Cutoff Time.

**232 0019**

(6)    **Other**. Such other items as are provided for in this Agreement or as are normally adjusted in the sale of real property in Hawaii or of a hotel or golf course except that in the case of any conflict, the terms of this Agreement shall be controlling.

Net credits in favor of Buyer shall be deducted from the balance of the Purchase Price at the Closing and net credits in favor of Seller shall be paid in cash at the Closing. Buyer is obtaining from Seller, as of the Closing Date, all food, non-alcoholic beverages, consumable supplies and other inventory located at the Property and there will be no prorations or adjustments therefor. Alcoholic beverage inventory shall be retained and sold by Seller under its liquor licenses until Buyer obtains its liquor licenses, with the net sales proceeds to be paid to Buyer in accordance with Section 9 below and no prorations or adjustments to the Purchase Price being made therefor.

(c)    **Closing Statement**.

(1)    Seller shall cause its accounting staff ("Seller's Accountants") to make such inventories, examinations and audits of the Property, and of the books and records of the Property, as Seller's Accountants may deem necessary to make the adjustments and prorations required under this section, or under any other provisions of this Agreement. Buyer or its designated representatives may be present at such inventories, examinations and audits of the Property. Based upon such audits and inventories, Seller's Accountants will prepare and deliver to the parties no later than three (3) days prior to the scheduled Closing Date a pre-closing statement ("Pre-Closing Statement"). The Pre-Closing Statement shall contain Seller's best estimate of the amounts of the items requiring the prorations and adjustments in this Agreement. The amounts set forth on the Pre-Closing Statement shall be the basis upon which the prorations and adjustments provided for herein shall be made at the Closing.

(2)    Within ninety (90) days following the Closing Date, Buyer shall cause the accounting staff for the Hotels and Golf Courses ("Buyer's Accountants") to prepare and deliver to the parties a final closing statement (the "Closing Statement") setting forth the final calculation of the amounts of the items requiring the prorations and adjustments in this Agreement. Any items which should have been included in the Pre-Closing Statement but were omitted therefrom, such items shall be adjusted in the same manner as if their existence had been known at the time of the preparation of the Pre-Closing Statement.

(3)    The Closing Statement shall be binding and conclusive on all parties hereto to the extent of the items covered by the Closing Statement, unless within thirty (30) days after delivery of the Closing Statement to the parties, either Buyer or Seller notifies the other that it disputes such Closing Statement, and specifies in reasonable detail the items and reasons that it so disputes. The parties shall attempt to resolve such dispute in good faith. If such dispute is not resolved within forty five (45) days after delivery of the original notice by Buyer or Seller, then such dispute shall be submitted to an outside accountant mutually agreed to by both parties ("Outside Accountants"), and the determination of the Outside Accountants, which shall be made within a period of fifteen

232 0020

(15) days after such submittal, shall be conclusive. The fees and expenses of the Outside Accountants shall be paid equally by Buyer and Seller.

(4)    The foregoing limitation shall not apply to any item which, by its nature, cannot be finally determined within the period specified. Notwithstanding the foregoing, in no event will any adjustments be made after the lapse of six (6) months after the Closing Date.

(5)    Upon final acceptance of the Closing Statement (either by expiration of the aforesaid 30-day period with no notice of dispute being delivered or by determination by the Outside Accountants), any net credits in favor of Seller shall be paid in cash by Buyer within ten (10) days of the date of such acceptance, or any net credits in favor of Buyer shall be offset against the balance due under the Note as of such date.

(d)    **Allocation of Purchase Price**. The parties shall mutually agree upon an allocation of the Purchase Price and shall report such allocation to the Internal Revenue Service on Form 8594. If the parties fail to so agree in a timely manner, then the allocation shall be conclusively determined by the Outside Accountants in the manner set forth hereinabove and the parties shall file the Form 8594 reports based on such determination.

7.    **Condition to Seller's Obligations**. Seller's obligation to sell and convey the Property to Buyer is expressly conditioned upon the following:

7.1    **Performance of Buyer's Covenants**. All covenants and agreements made by Buyer which are to be completed on or before the Closing shall have been performed in all material respects, and the Purchase Price shall have been delivered to Escrow Agent.

7.2    **No Untrue Representations**. As of the Closing Date, each and every one of the representations and warranties made by Buyer in this Agreement shall be true and correct in all material respects.

7.3    **Consents**. All consents necessary for the transfer of the Property, including, without limitation, the consent of Ground Lessors, if required under the Ground Leases, and the consent of the lessor under the Kiahuna Easement Lease, if required thereunder, shall have been obtained. Seller shall use its reasonable good faith efforts to obtain all such consents, but shall not be obligated to pay or expend any money as a condition to obtaining any such consent (other than payment of such lessors' reasonable attorney's fees relating to the assignment of such leases if required under the terms thereof). Provided that Seller has used its reasonable good faith efforts as aforesaid, the inability to obtain any such consents shall not constitute a default by Seller under this Agreement.

8.    **Condition to Buyer's Obligations**. Buyer's obligation to purchase the Property from Seller is expressly conditioned upon the following:

8.1    **Notice to Proceed**. Buyer shall have elected to proceed with the purchase of the Property by delivering to Seller the Notice to Proceed within five (5) business days after the expiration of the Due Diligence Period.

232 0021

8.2    **Performance of Seller's Covenants**. All covenants and agreements made by Seller which are to be completed on or before the Closing Date shall have been performed in all material respects, and all Transfer Documents and other material to be delivered by Seller at Closing shall have been delivered to Escrow Agent.

8.3    **No Untrue Representations**. As of the Closing Date, each and every one of the representations and warranties made by Seller in this Agreement shall be true and correct in all material respects.

8.4    **Consents**. All consents necessary for the transfer of the Property, including, without limitation, the consent of the Ground Lessors, if required under the Ground Leases, and of the lessor under the Kiahuna Easement Lease, if required thereunder, shall have been obtained.

8.5    **PUC Approval**. In the event that the transfer of the stock or assets of Pukalani STP Co., Ltd. and/or Sure Transportation, Inc. to Buyer is not approved by the Hawaii Public Utilities Commission prior to the Closing Date, Buyer shall have the option to close the purchase of the Property and defer the purchase and transfer of the STP Stock until such approval is obtained. In such event, Buyer and Seller shall cooperate and exercise their best efforts to obtain such approval as quickly as possible after the Closing Date.

9.    **Licenses and Permits**. Seller will maintain in effect until Closing, all licenses, permits and other authorizations from all federal, state, county and other governmental authorities necessary for the conduct of its business operations in connection with the Property or relating to the development of the Property, and will fully cooperate with Buyer and take all steps necessary to transfer to Buyer at Closing all of said licenses, permits and other authorizations as may be assignable. Buyer shall, at its sole expense (not including reasonable attorneys' fees incurred by Seller in its cooperation with Buyer under this section), take all steps to apply for the transfer of said licenses, permits and other authorizations pursuant to the rules and regulations of the applicable governmental agency. Buyer and Seller shall enter into an agreement providing for the continuation of Seller's operation of any premises covered by any existing liquor license until the approval of the transfer of such licenses to Buyer is approved by the applicable liquor commissions. Buyer shall receive the net profits from such operations and be responsible for any losses from such operations.

10.    **Condition of the Property**. Except as specifically provided in this Agreement, Seller shall not be required to do any further improvements or work on, under or about the Property, and Buyer is accepting the Property in its "AS IS" condition. Except as set forth in this Agreement, Seller expressly disclaims any and all liability for representations or warranties, express or implied, with respect to the Property or any matters related thereto contained in the Due Diligence Materials or any other documents delivered to Buyer by Seller or anyone else. Buyer acknowledges that Seller and Buyer have agreed that, except as set forth in this Agreement, Seller is making no representations or warranties, as to the accuracy of these materials and Buyer is to undertake and rely solely upon its own "due diligence" as to any matters of concern or importance to Buyer.

232 0022

11.    **Hawaii Dislocated Workers Act**. Seller shall comply with the notice and payment requirements of the Hawaii Dislocated Workers Act (the "HDWA"). Seller understands that the HDWA requires that the employer provide not less than sixty (60) days notice to affected employees and the Director of Labor Relations prior to the occurrence of a "closing" as defined in the HDWA and the regulations promulgated thereunder. Buyer and Seller agree to cooperate with respect to such compliance. Seller shall be solely responsible for payment of any dislocated workers allowances for its employees which arise out of the termination of employment by Seller. In order to comply with the 60-day notice requirements, Seller shall continue to employ Seller's employees for a period of not less than 60 days from the date when the notice is given. Seller shall lease such employees to Buyer under a leasing arrangement under which Buyer reimburses Seller for all wages and benefits payable to such employees during such period. At Buyer's option, the leasing arrangement may take the form of a hotel management contract, pursuant to which Seller would continue to manage the Hotels through the expiration of such 60-day period and the employee costs would be reimbursed to Seller. No fee or other compensation shall be paid to Seller under either arrangement.

12.    **Employees**. Although Buyer anticipates that it will offer employment to substantially all of the employees of Seller involved in the operation and maintenance of the Hotels and Golf Courses, Buyer shall have no obligation hereunder to offer employment to any employee of Seller. Seller shall be solely responsible for payment of any accrued vacation pay, sick leave, severance, separation or dislocated workers allowance payments payable to Seller's employees with respect to the period prior the Closing Date or arising out of the termination of their employment by Seller. In the event that Buyer elects, in its discretion, to carry over the accrued vacation, sick leave or other accrued benefits, the Purchase Price shall be reduced by an amount equal to the amount that Seller would have had to pay such employees if such benefits were not carried over. Seller shall indemnify, defend, protect and hold the Buyer harmless from and against any and all claims, damages, costs, fines, penalties, liabilities and losses paid or incurred by the Buyer, arising out of or related to any claims asserted by any employee of Seller, arising out of events occurring prior to the Closing Date.

13.    **Indemnification**.

13.1    **Seller's Indemnity**.

(a)    Seller hereby agrees to defend, indemnify and hold Buyer and its nominees harmless from any claims, causes of action, liabilities or damages, including, without limitation, attorneys' fees and expenses, directly arising out of or directly pertaining (i) to the ownership, use or operation of the Property by Seller prior to the Closing Date, including the acts or omissions of the Seller's employees in connection with the operation of the Hotels or Golf Courses, (ii) any breach of any representations, warranties or covenants of Seller contained in this Agreement, and (iii) any of the contracts, obligations or liabilities of Seller which are not assumed by Buyer. This provision shall survive the Closing.

(b)    Notwithstanding anything to the contrary in this Agreement, the representations and warranties of Seller contained in Section 4.1 of this Agreement (other

**232 0023**

than the representations contained in Section 4.1(a) and (b)) shall survive only for a period of one (1) year after the Closing Date and shall then become null and void and no claim thereon shall be brought by Buyer thereafter.

(c)     In the event that a matter arises which may result in a claim pursuant to such indemnities, Buyer shall provide Seller with written notice of the potential claim and shall allow Seller the opportunity to cure the matter complained of, if the same is curable.

(d)     If Seller does not commence a reasonable cure within thirty (30) days after such written notice is given to Seller, Buyer may proceed to cure the breach and proceed with its claim.

13.2     **Buyer's Indemnity**. Buyer hereby agrees to defend, indemnify and hold Seller harmless from any claims, causes of action, liabilities or damages, including, without limitation, attorneys' fees and expenses, arising out of or pertaining, directly or indirectly, to the ownership, use and operation of the Property by Buyer after the Closing Date. This provision shall survive the Closing.

14.     **Default; Remedy**.

14.1     **Default by Seller**. If Seller fails to perform any of its obligations under this Agreement, then Seller shall be in default under this Agreement. If Seller fails to perform such obligation within ten (10) business days after written notice from Buyer of such default, Buyer may either demand specific performance, or terminate this Agreement and seek damages from Seller, or exercise any other right or remedy available at law or in equity.

14.2     **Default by Buyer**. If Buyer fails to deposit the funds in the amounts and at the times required by this Agreement, then Buyer shall be in default under this Agreement. If Buyer fails to perform such obligation within ten (10) business days after written notice from Seller of such default, Seller may either demand specific performance, or terminate this Agreement.

IN THE CASE OF DEFAULT BY BUYER, IF SELLER ELECTS TO TERMINATE THIS AGREEMENT, SELLER SHALL BE ENTITLED TO RETAIN, AS LIQUIDATED DAMAGES, THE INITIAL DEPOSIT MADE BY BUYER AND ALL INTEREST THAT HAS ACCRUED ON SAID DEPOSIT. BUYER AND SELLER AGREE THAT THE DEPOSIT IS A REASONABLE SUM CONSIDERING ALL OF THE CIRCUMSTANCES EXISTING ON THE DATE OF THIS AGREEMENT, INCLUDING THE RELATIONSHIP OF THE SUM TO THE RANGE OF HARM TO SELLER THAT REASONABLY COULD BE ANTICIPATED, AND THE ANTICIPATION THAT PROOF OF ACTUAL DAMAGES WOULD BE COSTLY OR INCONVENIENT AND THAT BUYER WISHES TO LIMIT ITS

232 0024

POTENTIAL LIABILITY TO SELLER IN THE EVENT OF SUCH A DEFAULT BY BUYER BY PLACING THEIR INITIALS IN THE SPACE PROVIDED BELOW, EACH PARTY SPECIFICALLY ACKNOWLEDGES THAT IT HAS READ THE FOREGOING LIQUIDATED DAMAGES PROVISION, CONFIRMS THE ACCURACY OF THE STATEMENTS MADE ABOVE, AND AGREES TO THIS LIQUIDATED DAMAGES PROVISION.

| S. K. | | |
|---|---|---|
| SELLER        (INITIALS) | | BUYER        (INITIALS) |

15.    **Condemnation**.

(a)    If, prior to the Closing Date, Seller receives formal notice of condemnation or intent to condemn any portion of the Property, Seller shall immediately notify Buyer of such fact. In that event, Buyer shall have ten (10) business days in which to elect to either (i) terminate this Agreement, or (ii) proceed with Closing.

(b)    If Buyer elects to terminate this Agreement, then the Initial Deposit and any other deposit made by Buyer (plus any interest on such deposits that accrued while held in escrow) shall be returned to Buyer, Seller's documents shall be returned to Seller, and the parties shall thereafter have no further obligations to each other under this Agreement, except for the obligations under Section 17.11 hereinbelow, and such covenants and indemnities which expressly survive the purchase of the Property by Buyer.

(c)    If Buyer elects to proceed with Closing, then Seller shall assign and turn over, and Buyer shall be entitled to receive and keep, any and all awards made or to be made in connection with such condemnation or eminent domain, and the parties shall proceed to close the purchase of the Property pursuant to the terms hereof, without any reduction in the Purchase price.

16.    **Commissions**.

(a)    Seller shall indemnify, defend and hold Buyer harmless from and against any and all expenses, losses, damages and claims including, without limitation, reasonable attorneys' fees and costs, arising out of or relating to any claim for the payment of a broker's commission or finders' fees relating to the sale of the Property or execution of this Agreement based upon any agreement with Seller.

(b)    Buyer shall indemnify, defend and hold Seller harmless from and against any and all expenses, losses, damages and claims including, without limitation, reasonable attorneys' fees and costs, arising out of or relating to any claim for the payment of a broker's commission or finders' fees relating to the sale of the Property or execution of this Agreement based upon any agreement with Buyer.

232 0025

17.    **General Provisions**.

      17.1    **Time**. Time is of the essence of this Agreement. The Closing Date shall not be extended without the written consent of both parties. All references to "days" in this Agreement mean calendar days, unless specifically stated to be "business days." As used in this Agreement, the term "business day" means days other than a Saturday, Sunday or legal holiday in the State of Hawaii.

      17.2    **Notices**. Whenever any notice, demand or other communication is to be given under the provisions of this Agreement by either party hereto to the other party hereto, it shall be in writing and shall be (a) personally served, (b) mailed by United States registered or certified mail, return receipt requested, postage prepaid, (c) sent by a nationally recognized courier service *(e.g.* Federal Express) for next day delivery, to be confirmed in writing by such courier, or (d) transmitted by facsimile with appropriate provisions for confirmation of receipt, addressed as set forth below:

<table>
<tr><td>If to Buyer:</td><td>KG Holdings, LLC<br>Pauahi Tower, Suite 1570<br>1001 Bishop Street<br>Honolulu, Hawaii 96813<br>Attn:   Wayne Tanigawa<br>Facsimile No: 808-524-0766</td></tr>
<tr><td>With a copy to:</td><td>Tod Z. Tanaka, Esq.<br>Case Bigelow & Lombardi<br>737 Bishop Street, Suite 2600<br>Honolulu, Hawaii 96813<br>Facsimile No: 808-547-5572</td></tr>
<tr><td>If to Seller:</td><td>Sports Shinko (Hawaii) Co., Ltd.<br>Ocean Resort Hotel Waikiki<br>175 Paoakalani Street, Suite 300<br>Honolulu, Hawaii  96815<br>Attn: Satoshi Kinoshita<br>Facsimile No: (808) 931-4396</td></tr>
<tr><td>With a copy to:</td><td>Peter Hamasaki, Esq.<br>McCorriston Miller Mukai MacKinnon LLP<br>Five Waterfront Plaza, 4th Floor<br>500 Ala Moana Boulevard<br>Honolulu, Hawaii 96813</td></tr>
</table>

**232 0026**

Facsimile No. (808) 524-8203

In the event that a different address is furnished by either party hereto to the other party hereto in writing, notices, demands and other communications shall thereafter be sent or delivered to the new address. Service by mail shall be deemed complete on the day of actual delivery as shown by the addressee's registered or certified mail receipt or at the expiration of the third (3rd) business day after the date of mailing, whichever first occurs. Service by personal service or courier shall be deemed complete on receipt. Service by facsimile shall be deemed complete on confirmation of receipt.

17.3    **Assignment**. Buyer may not assign any right or rights under this Agreement, to any other person, firm or entity without Seller's prior written consent; provided that Buyer may assign its rights hereunder to one or more limited liability companies which are wholly owned by Buyer or its members without Seller's consent. Buyer may designate such entities as its nominee to take title to the Property at Closing.

17.4    **Relationship of the Parties**. Nothing in this Agreement shall be deemed to create the relationship of principal and agent between Seller and Buyer, nor shall this Agreement be deemed to make Seller and Buyer partners or joint venturers with each other.

17.5    **Entire Agreement: Amendments**. This instrument constitutes the entire agreement between Buyer and Seller regarding the Property, and there are no agreements, understandings, warranties or representations between the parties except as set forth herein. This Agreement cannot be amended except in writing executed by both Buyer and Seller.

17.6    **Binding Effect**. This Agreement will inure to the benefit of and bind Buyer, Seller and their respective successors and assigns.

17.7    **Construction**. This Agreement and any documents delivered pursuant to this Agreement will be construed without regard to which party drafted the document or any particular provision therein. This Agreement is governed by and shall be construed in accordance with the laws of the State of Hawaii.

17.8    **Severability**. The provisions of this Agreement shall be severable, and any invalidity, unenforceability or illegality of any provision or provisions of this Agreement shall not affect any other provision or provisions of this Agreement, and each term or provision of this Agreement shall be construed to be valid and enforceable to the full extent permitted by law.

17.9    **Attorneys' Fees**. If either party incurs expenses, attorneys' fees and/or costs to enforce this Agreement or because of a breach of this Agreement by the other party, the prevailing party shall be entitled to recover reasonable attorneys' fees, expenses and costs, from the other party.

**232 0027**

17.10 **Reliance by Parties**. Seller and Buyer acknowledge and agree that they have each retained their own respective experts to evaluate the condition and profitability of the Property, including but not limited to their own respective legal counsel, on whose opinion and advice they have solely relied in this transaction.

17.11 **Confidentiality**.

(a)    Buyer and Seller acknowledge that the terms, conditions and contents of this Agreement are confidential, and Buyer and Seller each hereby agrees that Buyer and Seller, and their respective directors, officers, employees, agents, legal counsel, consultants and contractors (collectively, "Agents"), shall keep the terms, conditions and contents of this Agreement, strictly confidential except as otherwise permitted in this Section 17.11. Accordingly, Buyer and Seller agree that they shall not, without the prior written consent of the other, release, publish or otherwise distribute, and shall not authorize or permit any of its Agents to release, publish or otherwise distribute, the terms, conditions and contents of the Agreement to any person other than such party and its Agents for this transaction, but then only to the extent that any such Agent needs to know the terms, conditions and contents of the Agreement to evaluate the Property.

(b)    All non-public information and materials relating to the Property obtained by Buyer shall remain strictly confidential, and shall not be disclosed except as provided in subsection 17.11(a) hereinabove.

(c)    Notwithstanding anything to the contrary, herein, neither Buyer nor Seller shall be in breach of its obligations under this Section 17. 11 if it or its Agents are required by law to disclose any such matters or if such disclosure is necessary or appropriate to secure governmental approvals for the Property.

(d)    The provisions of this Section 17.11 shall survive Closing or the termination of this Agreement.

17.12 **Counterparts; Facsimile Execution**. The parties hereto agree that this instrument may be executed in counterparts, each of which shall be deemed an original, and said counterparts shall together constitute one and the same agreement, binding upon all of the parties hereto, notwithstanding that all of the parties are not signatory to the original or the same counterparts. For all purposes, including, without limitation, recordation, filing and delivery of this instrument, duplicate unexecuted and unacknowledged pages of the counterparts may be discarded and the remaining pages assembled as one document. An executed counterpart of this instrument transmitted and received by facsimile shall be deemed for all purposes to be an original, executed counterpart hereof

[SIGNATURES ON THE FOLLOWING PAGE.]

232 0028

IN WITNESS WHEREOF, Seller and Buyer have executed this Agreement as of the date first above written.

Seller:                               SPORTS SHINKO (WAIKIKI) CORPORATION

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (KAUAI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (MILILANI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (PUKALANI) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

PUKALANI STP CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Vice President_

SPORTS SHINKO (HAWAII) CO., LTD.

By _Satoshi Kinoshita_
Name: _Satoshi Kinoshita_
Title: _Executive Vice President_

SURE TRANSPORTATION, INC.

By _Satoshi Kinoshita_

Name: _Satoshi Kinoshita_

Title: _Vice President_

Buyer:

KG HOLDINGS, LLC

By: _Wayne Tanigawa_

Name: _Wayne Tanigawa_

Title: _Manager_

**232 0030**